## Hall v. Commonwealth.

(Decided October 28, 1913).

### Appeal from Kenton Circuit Court (Criminal, Common Law & Equity Division).

1. Homicide—Instructions—Defense of Insanity—Malice.—The true test of responsibility, where the defense is insanity, is whether the accused had sufficient reason to know right from wrong, and whether or not he had sufficient power to control or govern his action, and the instruction complained of here met the requirements of this test. If it was error, which is not conceded, in further saying to the jury that they might acquit if they found defendant was without sufficient mind or reason to know what he was doing, it was merely giving an additional ground to acquit him, and was not prejudicial.

2. The objection to the instruction defining malice is not sustained for the instruction defines the term as used in "these instructions," and "these instructions" include all the instructions, and all of them make particular reference to the homicide for which defendant was tried.

3. Verdict—Evidence.—While the evidence was conflicting, there is certainly not a preponderance against the verdict, and it being the province of the jury to judge of its weight and credibility, the verdict will not be disturbed.

BYRNE & READ for appellant.

JAMES GARNETT, Attorney General, D. O. MYATT, Assistant Attorney General and R. G. WILLIAMS for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Appellant, Joseph Hall, was tried and convicted of the murder of Eddie Smythe, and sentenced to life imprisonment.

Hall and Smythe were rival suitors for the hand of the same lady, and this murder occurring on July 24, 1912, was the outgrowth of it. From the proof we gather the following facts.

Hall had been paying his respects to the lady for about five years, and for about two years prior to February, 1912, was engaged to be married to her. On the 9th of February they had a disagreement and the engagement was broken, and their associations ceased for a time. On the 6th of May following she was introduced to Eddie Smythe, and he began to keep company with her. Hall made no effort to resume his former relations, and his affections were quiescent until Smythe began courting her in May. Smythe's visits to the lady were not only frequent, but acceptable to her. On the 4th of July Hall went to see her again, and took her out to a picnic, and on July 22nd he again went out with her, but from the 4th until the 24th, when Smythe was killed, Hall and the lady saw each other almost every day, as they had rooms in the same house. Hall objected very seriously to the lady keeping company with Smythe, and the proof shows that he told her some stories derogatory to Smythe in the hope that she would desist, and threatened if she did not, that he would carry these stories to her father with whom she resided. There is some question as to whether these stories were true, but whether true or not is really not material here. At all events they did not serve the purpose Hall intended.

She had an engagement with Smythe for 7:30 o'clock p. m. on the 24th, and on that day Hall had been to see her three different times. The lady lived with her father on the third floor of a house situated at the corner of 19th and Madison streets in Covington. Another family occupied the second floor, and Hall was living in one of the second floor rooms which he had rented from, that family. There was a saloon on the ground floor. A stairway lead from the ground to the third floor, and the landing at the second floor was in sight of, and near to, Hall's room door. At 7:30 p. m. on the 24th, Smythe appeared to fill his engagement, and as he came out of the building accompanied by the lady, Hall was standing at the corner, and began to curse and abuse, and throw rocks at Smythe who had not even spoken to him. In

the altercation that ensued, Smythe and Hall fell to the ground, with Smythe on top. They were separated by a bystander, and Smythe's clothing having become soiled, he went to his room, a block distant, to change. The lady also returned to her room, and Hall remained in the neighborhood making threats that he would get even with Smythe because he had taken his girl away from him.

When Smythe shortly returned for the lady, Hall was there with rocks in his hand, but he dropped them and neither paid any attention to the other. Smythe and the lady went out for a walk and returned about nine o'clock and went to her room. In a few moments the lady's married sister with her husband came to call, and as they left, about half-past nine, Smythe attempted to take his departure with them. Hall had gone to his room on the second floor, and sat there with his door open with the lights turned out, and a shotgun pointing toward the stairway landing which he could plainly see. Smythe followed the couple, and as he turned to go down the stairway from the second floor, Hall fired upon him, emptying the contents of the shotgun in Smythe's back. Smythe fell down the stairway, and the lady above hearing the report rushed down to the second floor, seeing Hall with the gun asked, "in the name of God what made you do it Joe?" and to which he responded, "I done just what I wanted to do."

Smythe was rushed to a nearby doctor's office, but he was beyond help, and died in a few moments.

On the trial of the case Hall did not testify, and insanity was the only defense offered in his behalf. The court gave proper instructions on murder and voluntary manslaughter, but the appellant objects strenuously to the instructions on insanity and the one defining malice, and in order that his objections may be understood, these instructions are here copied:

### Instruction Four.

"If you believe from the evidence that at the time defendant shot and killed Edward Smythe he was without sufficient mind or reason to know what he was doing, or had not sufficient mind or reason to know right from wrong, or that as a result of mental unsoundness he had not then sufficient will power to govern his actions by reason of some insane impulse which he could not resist or control, you will find the defendant not guilty, because of insanity.

The law, however, presumes every man sane until the contrary is shown by the evidence, and before the defendant can be excused on the ground of insanity, you must believe from the evidence that the defendant at the time of the killing of Smythe was without sufficient mind or reason to know what he was doing, or had not sufficient mind or reason to know right from wrong, or that as a result of mental unsoundness he had not then sufficient will power to govern his actions by reason of some insane impulse which he could not resist or control.''

### INSTRUCTION SIX.

''The term 'with malice' as used in these instructions means 'the absence of legal excuse or justification,' and the term 'aforethought' as used in these instructions means a predetermination to do the act complained of, and it is not material how suddenly or recently the predetermination was formed.

''The words 'willfully' or 'willful' as used in these instructions mean 'intentionally, not accidentally or involuntary.' ''

Appellant complains that although he may not have known right from wrong, and by reason of mental unsoundness did not have will power to control his actions, still by instruction four, in order to acquit they must also believe he at the time did not know what he was doing, and to sustain his position quotes the following from the case of Smythe v. Commonwealth, 1 Duval, 232:

''The true test of responsibility is, whether the accused had sufficient reason to know right from wrong, and whether or not he had sufficient power of control to govern his action.

It will be observed, however, that under the instruction given by the court, it met the requirements of this test, for it authorized the jury to acquit if they found he did not have mind enough to know right from wrong, or by reason of mental unsoundness did not have will power sufficient to govern his action. The court, by further saying to the jury that they might acquit if they found he was without sufficient mind or reason to know what he was doing, was merely giving to the jury an additional ground to acquit him, and for which the accused will not be heard to complain. If it was error, which we do not concede, it was not prejudicial to him.

By the instruction the jury was not required to believe that there must be a concurrence of his ignorance of what he was doing, and of right from wrong, and of insufficient will power to govern his actions. They were authorized to acquit if he was lacking in either of these three mental conditions.

The instruction on insanity is in the usual form, and has been approved by this court in the case of Abbott v. Commonwealth, 107 Ky., 624, and Mathley v. Commonwealth, 27 Ky. L. R., 785. (Not officially reported.)

It is insisted that the definition of malice as given in instruction six, viz.: "The absence of legal excuse or justification," is erroneous, because it is not related to any particular act, and because under it the jury must believe this killing was malicious although they may believe it was done by an insane person. It cannot be said that the definition of the term "with malice" does not relate to this homicide, for the instruction itself defines the term "as used in these instructions," and "these instructions" include instructions one, two, three and four, and all of them made particular reference and relate to the homicide for which the accused is being tried. Neither can it be said that the definition of malice as given by the court will not excuse the act if committed by an insane person. Malice as defined by the court is the absence of legal excuse, and if the jury had believed it was the act of an insane person, then they must have believed that a legal excuse was present, for a homicide committed by an insane person is excused, and the jury were so told by instruction four.

The Commonwealth's evidence, in chief, proved the commission of the offense. No testimony was offered or question asked relative to the insanity of the accused. That question did not appear in the case until the attorney for defense came to make his statement, when he announced that a defense of insanity would be his reliance. He then introduced quite a lot of proof to show that Hall was insane. The proof was strong, and as read from the record, tends to excite grave doubt in the minds of this court on that question. The Commonwealth in rebuttal then introduced numerous witnesses giving testimony equally convincing that Hall was sane. The defendant at the conclusion of the Commonwealth's testimony, in chief, asked the court to give peremptory instruction to find for the defendant because there had been no evidence introduced to show that he was of

sound mind. He also objected to the introduction of the rebuttal evidence of the Commonwealth on the question of sanity, because, as he argues, this evidence should have come in chief, and that none of it related to the very moment of time when the offense was committed.

The law presumes that every man is sane until the contrary is shown by the evidence. If the defense is one of insanity there must be some proof to support it to rebut this legal presumption of sanity. Hence, there was no occasion for the Commonwealth to offer proof on the question other than in rebuttal.

Of course, the real test as to whether one may be excused for a crime on the grounds of insanity is the state of his mind at the time he committed the offense, and it is perhaps true that no witness undertook to say whether he was sane or insane at that particular time. Necessarily all testimony on a question of this sort is opinion. That is the best evidence available on the point. Positive proof is impractical. Medical and lay testimony was introduced by both sides, and under the wide latitude allowed on the question of sanity, all the witnesses qualified as experts, and each gave his opinion, pro and con, based on incidents and circumstances occurring within a range of many years before the homicide, and on up to the trial. And on these incidents and circumstances together with what the witnesses have heard and seen the accused say and do, and with test examinations made by physicians, each witness gave his opinion as to whether he was sane or not at the time the offense was committed based on his observations within this long range of time.

As above indicated, this testimony is quite conflicting, and the record is calculated to give the reader as many different opinions as he cares to peruse it, but the jury saw the witnesses and heard them testify, and it is their province to judge of the weight and credibility of their evidence. There is certainly not a preponderance of the evidence against their verdict, and we, therefore, do not feel inclined to disturb it.

The judgment is affirmed.