## Vaughn v. Commonwealth.

(Decided July 1, 1924.)

## Appeal from Hardin Circuit Court.

1. Criminal Law—Instructions Applicable to Every State of Case Should be Given.—Instructions applicable to every state of case, deducible from testimony or supported by it to any extent, should be given.

2. Homicide—Court Held to have Erred in Refusing to Instruct upon Manslaughter.—Where defendant learned of illicit relations between wife and deceased almost year before killing, and facts strongly refuted inference of malice, held that court erred in refusing to instruct upon voluntary manslaughter.

3.  Homicide—Whether Killing Result of Insanity or Sudden Heat and Passion Held for Jury.—Whether killing was result of insanity or of sudden heat and passion, under sufficient provocation, held for jury.

4.  Witnesses—Wife Not Competent Witness in Defendant's Behalf. —In prosecution for homicide, wife of accused was not competent witness to testify that she confessed to her husband illicit relations with deceased.

5.  Criminal Law—Change of Venue Within Sound Discretion of Court.—Action on motion for change of venue rests within sound discretion of court, and will not be disturbed in absence of abuse.

6.  Criminal Law—Argument of Counsel Held Erroneous.—In a homicide case, argument of Commonwealth's counsel that jury were trying deceased as well as defendant, in that defendant accused deceased of improper relations with wife, and that defendant had tried to get money from deceased, held improper.

HAYNES CARTER, C. B. LARIMORE and C. C. BAGBY for appellant.

THOS. B. McGREGOR, Attorney General, and CHAS. W. LOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE O'NEAL—Reversing.

Appellant, Finis M. Vaughn, shot and killed Robert L. Rider in the Christian church at Glendale on Wednesday evening, September 20th, 1922. He was indicted upon the charge of wilful murder and was tried and convicted in the Hardin circuit court, his punishment being fixed at life imprisonment. His motion for a new trial having been overruled, he prosecutes this appeal, seeking a reversal on the following grounds:

1.  Failure of the court to instruct on manslaughter.
2.  Misconduct of attorneys for the Commonwealth.
3.  Rejection of competent evidence offered by the defendant.
4.  Refusal to grant a change of venue.
5.  Newly discovered evidence.

Since we have concluded the judgment must be reversed and the case retried, we will only summarize so much of the evidence as is necessary to a proper understanding of the questions raised upon this appeal.

Appellant, together with his wife, fifteen-year-old son and two younger daughters, lived on a farm in Hardin county, half a mile southwest of Glendale, in which village Robert L. Rider resided and conducted a mercantile establishment. During the fall of 1921, for the reasons hereinafter stated, appellant became convinced, or,

for mercenary reasons as claimed by the Commonwealth, pretended to have become convinced that Rider had debauched his wife and broken up his home, and he accordingly instituted an action for divorce against his wife, and filed a suit for damages against Rider, both of which were based upon charges of their misconduct. He was defeated in the divorce action, but the damage suit against Rider was still pending at the time of the tragedy upon which this prosecution is based.

The material facts of the homicide are substantially undisputed. As stated before, it occurred in the church while services were in progress. Rider was seated to the left of the center aisle facing the minister and with his back toward the rear door. Some sixty or seventy men, women and children were in attendance and among them were appellant's wife and two little daughters, who were seated about three rows in front of deceased. Shortly after the meeting began, appellant entered through the rear door and sat down back of and to the right of Rider. After looking over the audience for five or ten minutes, he went out and was gone for half an hour or more. Upon his return he again entered the rear door, pulled a chair out into the open space at the rear of the church and to the right of the aisle, and sat down. He was thus back of and to the right of Rider. For some ten minutes he sat nervously in his chair, looking over the audience and particularly in the direction of the deceased. The closing hymn had been sung, and a convert had gone forward to make his confession; it was the most solemn moment of the services, and there was not a sound in the church. Suddenly appellant sprang up from his chair, advanced one or two steps toward Rider, mumbling indistinctly, according to the majority of the witnesses, but saying, "I've got you, you ——," according to at least two witnesses, and before Rider could do more than half rise from his seat, he shot the latter five or six times, killing him almost instantly.

Appellant's defense was insanity of the type characterized by the physicians who testified for him as acute mania. In support of that defense his evidence tended to prove the following state of facts: He had become suspicious of his wife's conduct in the summer of 1921, and his suspicions were greatly increased, and centered on Rider when he saw the latter squeezing his (appellant's) wife's hand in the same church in which later the tragedy occurred. Shortly after having observed this familiarity,

he was advised by several of his colored neighbors that Rider was in the habit of visiting his wife during his absence and particularly on Sunday mornings. He also learned that Rider had given his wife various presents, among them a pair of shoes. On Thanksgiving morning his fifteen-year-old son asked at the breakfast table in the presence of himself and his wife, "what the devil Rider was doing" slipping around the back of their house the night before, as he had seen him doing. This augmented his suspicions, and he determined to ascertain the truth of the report he had heard. He pretended to his wife that it was necessary for him to be absent from home for a few days on business, and accordingly he left on Thanksgiving afternoon. He returned secretly about 9:30 the same evening, hid under a rose bush in his yard, and watched his house for some time, without results. He again left and did not return until about 2 a. m. the following Sunday morning, at which time he climbed up over the kitchen and entered a second story window and secreted himself under the bed in which his son was sleeping. There he remained in hiding until late Sunday morning and until after his children had gone. He then came out from his hiding place and went to the window, where he could watch his wife doing her daily chores in the yard. He saw her enter one of the outhouses at the rear of the place, but from his position could not see anyone who might enter the building by the rear door. His wife remained in the outhouse for about twenty minutes, and he became convinced that she was with Rider. He armed himself with a pistol and started to go out where he believed the guilty couple to be; he met his wife returning to the house, and his threatening appearance so startled her that she became very much excited and wanted to know what it meant. He told her his suspicions, and she broke down and confessed her guilt and begged him to do nothing violent for the sake of the children. He was terribly upset, unable to sleep or eat, and did not know what to do. He sought out Rider a few days after his wife's confession and demanded an explanation. The latter advanced upon him with his hands in his pockets and in a threatening manner, whereupon appellant pointed his pistol at him and threatened to kill him if he undertook to do anything. Deceased agreed to go across the street to the bank where they could talk it over, and went to get his hat but never returned; and the record does not show

that appellant ever saw him again from that day in November until he shot him to death the following September. Immediately after his wife's confession appellant ceased to live at home, although occasionally going there to see his children and to take care of his stock and other property. He slept in the house upon several occasions but always with his son. After his wife had confessed, he made other investigations among his neighbors, and at the trial of his divorce suit proved by numerous witnesses who testified in his presence that his wife had confessed her guilt to them. He states that he did not live anywhere particularly after he left home, but wandered from place to place until the following July, when he went to Lexington. He went there to be near his boy, who had been sent to Greendale some time in April, 1922. In Lexington he worked for the C. & O. Railroad, and while in its employ and because of the labor troubles then existing he prchased a pistol with which he afterwards killed Rider. During all the time he was in Lexington he was sick, restless, and worried so that he could neither sleep nor eat. He was confined to the hospital in Lexington, suffering from high fever and headache; but on Saturday, September 16th, he was permitted to leave, upon his promise not to attempt any work and upon his assurance that he wanted to go home to see his family. He visited his children at Glendale on Sunday, and then visited other relatives in the neighborhood of Elizabethtown until the following Wednesday. While in Elizabethtown on Wednesday he purchased twelve cartridges, which he states he had been in the habit of doing and that he had purchased a thousand theretofore. That same night he returned to Glendale, arriving there about 7:30, his sole purpose being to see his family. He disclosed his purpose to one Will Grimes, and the latter informed him that there was a meeting at the Glendale Christian church and he was certain to find his family there. He therefore went to the church for that purpose. Upon arriving at the church he sat down and looked around for his family, and, as he had been away for some time, he glanced around to see who else that he knew was there. He saw Rider, but had no desire and no intention of harming him, and had no idea of seeing him when he went there. He did not see his family, although they were present, and after looking around for a few minutes, and believing his family to be at home, he left and walked to his home some half mile distant, and at that time had no idea of return-

ing to the church. There he saw a light burning in the house, but found the doors locked. He took a drink or two out of a pint bottle of whiskey which he had brought with him from Lexington the preceding Saturday; and, believing that his family must be at the church and that he had overlooked them on his first visit, he returned to the church. At that time he entertained no feeling of hatred toward Rider and did not intend to harm him in any way. He walked into the church and took a seat in the rear. He was then asked what he saw when he sat down, and he replied: ''Well, when I walked in and sat down, as soon as I came in Mr. Rider threw his eyes right on me, and he just sat there and watched me, looked under the corner of his eyes like this (indicating) and had his hands throwed down in his lap.'' His recollection of what occurred thereafter is vague and indistinct; it was then, so he claims, that he was overcome by an attack of acute mania superinduced by the long period of mental and physical anguish he had undergone as the result of the debauching of his wife and the wrecking of his home and happiness by the man who sat and stared steadily at him. He did not know just what he did do; his mind was on what he saw in the same church the last time he was there, his wife and Rider ''fooling with each other,'' and he thought ''it started there and it just as well end there,'' and he believed he said something of that sort to Rider and ''reckons'' he shot him, although the next thing he remembered was when he was being held by a number of men. Numerous witnesses stated that he had been a changed man for many months, that he ate and slept little, talked constantly of his ruined home and family troubles and upon the slightest provocation wept over his alleged wrongs, and that in their opinion he was of unsound mind at the time of the homicide.

Upon this state of facts the court properly instructed the jury as to the law of wilful murder and the defense of insanity, but refused defendant's request for an instruction on voluntary manslaughter.

It is a well settled rule of law that instructions applicable to every state of case deducible from the testimony or supported by it to any extent should be given. Greer v. Commonwealth, 23 R. 489; Tucker v. Commonwealth, 145 Ky. 84. The rule is thus stated in Bowlin v. Commonwealth, 94 Ky. 391:

''In fact it is not the province of the lower court any more than of this, to weigh evidence for the pur-

pose of determining whether a person on trial for his life is entitled to an instruction as to manslaughter; but if there is any evidence tending to show the homicide is of the degree of manslaughter, the accused is entitled to an instruction upon that hypothesis.''

After a most careful consideration of the record in this case, we feel constrained to hold that the court erred in refusing to instruct the jury upon the subject of manslaughter.

The Commonwealth neither proved nor undertook to prove a single threat made by the appellant, nor is there any evidence that he ever attempted, prior to the night of the homicide, to harm Rider in any way or even contemplated doing so; in fact the record is barren of any proof of malice other than that inferred from the homicide itself and the original cause which led up to it. On the other hand appellant's evidence, whether credible or not, strongly refuted the inference of malice, and tended to show that appellant committed the homicide under emotions suddenly aroused beyond control by the memory of his alleged wrongs, the presence and the conduct of the wrongdoer and the surrounding circumstances, and without any malice or premeditation on his part. Whether he acted under such emotions so aroused, and whether they were the result of insanity or of sudden heat and passion under sufficient provocation, were questions solely for the jury to weigh and determine, and that issue should have been submitted under proper instructions.

In so holding, we are but following a wise and just precedent of long standing in this Commonwealth. Shepherd v. Commonwealth, 119 Ky. 931; Shipp v. Commonwealth, 124 Ky. 643.

It is urged that the court erred in refusing to permit appellant's wife to testify in his behalf, as to what she told him concerning her misconduct with deceased. It has been repeatedly held by this court that she is not a competent witness for this purpose, and the court therefore did not err in so holding.

It is further insisted that appellant's motion for a change of venue should have been sustained. This is a matter that rests within the sound discretion of the court, and unless that discretion is clearly shown to have been abused, the action of the court will not be disturbed. It is sufficient to say in the present case that under the evidence heard upon the motion the court would not have

been justified in sustaining the motion, and it therefore did not abuse its discretion in overruling it.

During the course of the arguments for the Commonwealth counsel used the following language:

> "I will ask you, gentlemen of the jury, if Nannie Phillips did not state that Mrs. Vaughn asked her to come here and give her deposition. I say she made that statement; if I am wrong, you will not consider it. I asked her the question and she said that Mrs. Vaughn asked her to come and tell what she had told about her."

And again:

> "He was demanding at the hands of Robert Rider money, and at the same time he was living with the woman that he says Robert Rider —"

And again:

> "He says he stayed there, didn't he? He says he stayed there night after night."

And again:

> "Remember this, gentlemen, get this idea out of your head for a minute—remember you are trying Robert Rider too. Whenever you come in, gentlemen, and say in this case, 'not guilty,' remember that you are putting the stigma of guilt upon an assassinated citizen, and you are putting that stigma of guilt upon that man without an opportunity to be heard in a court of justice."

And again:

> "Why, gentlemen, he started out on a money hunt; he had demanded it, and he said he could not get a damn cent. He had sued his wife and didn't get a divorce. He had filed a suit against Bob Rider, and didn't get any money."

These statements were improper and necessarily prejudicial, and appellant's objections thereto should have been sustained. However, as the judgment must be reversed because of the failure of the court to give an instruction on manslaughter, it is not necessary to determine whether or not these improper statements were sufficiently prejudicial in themselves to justify a reversal.

Other alleged errors are complained of, but they concern matters which will have no bearing upon the retrial of this case, and for that reason we do not find it necessary to discuss them in this opinion.

For the reasons indicated the judgment is reversed.

Chief Justice Sampson dissenting.

DISSENTING OPINION BY CHIEF JUSTICE SAMPSON.

The only important question presented by this appeal from a conviction in a homicide case is, whether the trial court should have given an instruction to the jury upon the law of manslaughter. Does the evidence set out below warrant the giving of such an instruction?

In the solemn stillness of the little church at Glendale, where all the neighbors had gathered and were peacefully and prayerfully listening to the confession of faith of a new convert whom the minister was receiving into the church, six fiercely loud pistol shots suddenly and unexpectedly rang out, throwing the crowd into confusion and changing the whole situation from grand solemnity into tense excitement and fear. Human blood was flowing and death was in their midst. Into the arms of his wife and family who surrounded him, fell Robert Rider, a leading citizen and business man of the village, dying. Appellant Vaughn admittedly committed this crime in that place of worship for purposes of revenge only, and not in self-defense. The motive was revenge, for Vaughn says he shot Rider for an old wrong, and it was not in self-defense, because Rider was not fighting or offering to fight. The shooting took place about 8:30 p. m. and the church services had progressed to that point where the minister had called for joiners. The house was reasonably well filled. The services opened about 7:30 o'clock, but the deceased Rider and his wife and family came in early and took their accustomed seats to the front on the left side of the aisle, with their backs toward the door. In the audience, but at quite a different place in the church, sat Mrs. Vaughn, wife of appellant, and some of her children. After the services opened and while, as some of the witnesses say, a religious song was being sung by the audience, appellant Vaughn came in at the door and walked up the aisle part of the way and took a seat on the right-hand side to the rear and not far from the deceased, but at that time the deceased had his face

towards the minister and pulpit and did not see appellant or know of his entrance into the church. After sitting there about five or ten minutes and looking around and, as appellant says, observing Rider and his location in the church, appellant arose and left the church and remained outside some twenty-five or thirty minutes. In the meanwhile the religious services went on. One or more persons entering the church observed appellant Vaughn in the anteroom at the door as though waiting. Another witness testified that he saw appellant at different times peeping in at the partly open door as if looking for some one. To do this appellant pushed the swinging door open slightly. Appellant admits that he had a pint of whiskey and had been drinking of it but could not tell whether he had consumed all of it. Several witnesses testified they smelt whiskey on his breath, but he did not act like a drunken man. His strange conduct attracted attention. About the time the services were concluding appellant came in the church a second time and pulling a chair into the aisle just back of the deceased, sat down. Several persons observed him coming in and one or more of them kept their eyes on him for, as they say, they had heard he had threatened to take the life of Robert Rider, who then sat in the congregation. It was the most solemn moment of the services. Everything was very still. Most of the congregation had their eyes upon the candidate and the minister; but in the neighborhood of where defendant Vaughn sat and to the rear of deceased, Rider, were a number of persons who, to see the minister and the candidate at the chancel, had to look past, over or around Robert Rider. They say that at this time Rider, who was in their vision, was sitting with his face towards the minister and with his back towards Vaughn, his eyes fixed upon the ceremonies in front of him, his hands laying on his lap; he did not look around to see nor did he apparently know of the presence of Vaughn. He was entirely innocent of the plan which Vaughn had devised for taking his life, for he had not turned his head in the direction of the door or where Vaughn sat since the services opened. After sitting in the aisle a few minutes, suddenly and unexpectedly Vaughn sprang up from his seat, only a few feet behind the deceased Rider, and exclaiming, "You damn son-of-a-bitch, I have got you now," began firing the bullets from a six-shooter revolver into the head and body of Rider. The loud crack

of the gun no less than the profane language of appellant stirred and excited the congregation into a high frenzy, and the religious services were abandoned in an effort to see what was going on and to seek safety. When appellant Vaughn began to shoot Rider he (Rider) arose from his seat and called "Alma," his wife's name, but made no effort whatever to protect himself or to injure Vaughn. Soon his friends laid him on a bench in the church, where he shortly thereafter expired. Others seized appellant Vaughn and, after a struggle, took from him the smoking pistol. Of the large concourse of people present many became witnesses at the trial. Not one of them gave evidence tending to show that deceased Rider knew of the presence of Vaughn in the church or that he had anything upon his mind other than the religious services going on in his presence. He was unarmed and entirely defenseless. The killing was, if the evidence be accepted as true, the grossest kind of assassination, there not being a word of evidence in the record anywhere to justify the killing or to mitigate the crime in the slightest degree, save a few statements made by appellant at the trial.

Appellant did not claim self-defense at his trial, although immediately after the shooting he gave utterance to such a claim. No doubt he was advised the evidence would not support such a plea. He relied at the trial solely upon "acute mania" or irresistible impulse to kill Rider, one or both, and it is hard to tell from his plea and the evidence exactly upon which he rested his case. It is true he offered evidence to show that his wife, who to this day is shown to be entirely loyal to him, had been intimate with deceased Rider some year or two before the killing, but he makes no pretense that any such intimacy had existed between Mrs. Vaughn and Rider for many months next before the killing. The evidence was totally insufficient, I think, to sustain the charge by Vaughan against his wife. He had sued his wife for divorce upon the ground of infidelity, but being unable to establish his case by evidence it was dismissed. He also sued Rider for a large sum in damages for alienating the affection of his wife, but in this he was unsuccessful. There is evidence in the record, however, tending to show that Vaughn had attempted to compromise the damage claim with Rider and that this proposition had been rejected. Of this appellant complained bitterly to some of his friends, saying that Rider had refused to

offer him a "damn cent." This seemed to have angered appellant and increased his malice towards the deceased, Rider. Along about this time, so witnesses testified, they saw appellant at nighttime lingering about the rear door of the store of Rider as if in expectation of Rider, as was his custom, to come out the back door way to close up his warehouse at the rear before closing his store for the night. On different occasions appellant Vaughn related his side of the divorce case and damage case to persons and bitterly reviled Rider. Months before the homicide appellant Vaughn, armed with a pistol, entered the store of deceased and accosted deceased and threatened, if he did not actually attempt, to kill him. These troubles seemed to be largely upon appellant's mind and he brooded over them. On the afternoon before he assassinated Rider he bought fresh catridges for his pistol. He also bought a pint of whiskey.

After locating Rider in the church he went out and took another drink of whiskey, as he says, and then came in and immediately pounced down upon his unsuspecting victim in the manner above related. Some one may say that the crime was not assassination, but I think it comes clearly within Bouvier's definition:

> "A murder committed treacherously, with advantage of time, place, or other circumstances."

Notwithstanding the fact that he claims that Rider had alienated the affections of his wife, Vaughn continued to stay at home more or less, and it was shown by the evidence of at least two witnesses that he and his wife were cohabiting together as other married people. This is sustained by appellant's statement that he had come home to see his family and was then looking for his wife. Moreover, she, never faltering, went to neighbors and told them she had been untrue to her husband and that she had submitted herself to Rider, and then ask them to go to the trial and testify to her confessions in order to help her unworthy husband evade the just penalties of the law. This was after the killing and in preparation of a defense. The wife was cooperating with her guilty husband in the preparation of a defense, largely conceived and prepared to meet the needs of the case. This evidence makes it very doubtful, if not absolutely certain, that there was no foundation for the charge made by appellant that Rider had been intimate with Mrs. Vaughn. It is, therefore, the theory of the

Commonwealth in the prosecution of this case that appellant Vaughn was seeking money more than the rectitude of his home, and when he failed to get it from Rider, decided to wreak vengeance by taking the life of the man whom he had sued. All in all, one cannot conceive of a case in which there was a more settled, fixed or certain malice in the heart of a killer than in this case. Vaughn laid a murderous plan, and with a heart filled with vengeance and steeled to the purpose, carried it out in the most wicked and unmerciful manner of which the human mind can conceive.

A jury of his peers, after hearing his complaint, rejected his plea of insanity and irresistible impulse and found him guilty, fixing his punishment at imprisonment for life. It is now insisted by appellant, and the majority opinion accepts this view, that he was entitled to an instruction upon the law of manslaughter, a crime less than murder. Such an instruction can only be warranted by evidence tending to establish that crime, or in cases where the facts are only established by circumstances, neither of which is true here. The only evidence upon which he relied for this instruction is his own answer to the question: "Q. What did you see when you sat down in the church that time (meaning the second time he entered the church)?" His answer was, "Well, when I walked in and sat down, as soon as I came in Mr. Rider threw his eyes right on me and he just sat there and watched me, looking under the corner of his eye like this (indicating); and he had his hands thrown down in his lap." Of course there is not a word of truth in the statement that "Rider threw his eyes right on me," as shown by all the evidence, save that of Vaughn. Of all the church crowd present not one sustains appellant in this statement. On the contrary, a large number, and in fact all of them who testified, stated that his victim never turned his face in the direction of where appellant was and could not and did not see or know of Vaughn's presence there. Appellant alone testifies that Rider looked at him. If this had been true a number of persons sitting to the rear of Rider and looking over his head or across his shoulder towards the minister would have observed him turn his head, but no one corroborates appellant in his statement. Let it be granted for purpose of argument that when appellant entered the church and took his seat deceased turned and looked at him. Was this justification for the killing, or

did it suffice to reduce the crime from murder to man-slaughter? Was it wrong for Rider to turn and look at the appellant, to watch him who had been threatening to take his life? Appellant admits he was looking at Rider. Surely, if Vaughn had a right to look at and watch Rider, the latter had a right to look at Vaughn.

Appellant's answer further shows that Rider did nothing whatever to injure him or to offend him. He says that Rider did not speak to him and was sitting with his back towards him with his hands "thrown down on his lap." He did not claim Rider was about to draw a weapon or to assault appellant in any way. His only claim is that a year or two previous to that time—a period long enough to allow one's anger to cool—deceased had alienated the affection of appellant's wife. There was no sudden heat of passion about the killing. There could have been none. Appellant knew that Rider was in the church, for appellant saw him when appellant came in the first time; he did not shoot him then but took time to think it over. After locating Rider he went out and took another drink and steeled himself to the work which he was about to perform. He then returned to the church and after sitting only a few minutes and looking at his unsuspecting victim, suddenly sprang up and began to shoot him at a time when there was not the slightest occasion for so doing.

The statement of appellant, "I have got you now," made as he began shooting Rider, clearly shows, I think, exactly what the prosecution contends, that appellant killed Rider with malice aforethought. It indicates that appellant Vaughn had made previous unsuccessful attempts to "get Rider," for, if not so, why did Vaughn say "I have got you now?" The word "now" is both significant and important. The statement implies that he had failed in his purpose at other times, otherwise he would have said "I have you." The statement presents the thought that appellant had laid other plans or set other traps to "get" Rider but that Rider had avoided them and thereby escaped, but "now" it is different and "I have got you now," you cannot escape.

But appellant says he did not swear an oath, as stated by the witnesses for the Commonwealth, but said in substance, "It began here and just as well end here." Let's accept that statement as true for purposes of argument. What "began here?" appellant's ill-will towards and hatred of Rider; so, according to appellant's own

statement, he killed Rider because of an old hatred—a malice formed months before the killing—which is, as will be seen from a definition of "malice aforethought," the thing which irrevocably fixed the crime as murder. "The phrase 'malice aforethought' means a predetermination to do the act of killing without legal excuse, and it is immaterial how suddenly or recently before the killing such determination was formed."

The words employed by appellant as he began to shoot clearly show his mind was operating. He says he was thinking. In answering a question propounded by his own attorney as to what he was thinking about when he began to shoot, appellant answered: "I just thought it started there and it just as well end there." This throws much light on his mental attitude and condition. His words prove he was thinking and that he did know exactly what he was doing and why he was doing it. He was killing the object of his hatred, because he claimed that on a former occasion his victim had squeezed the hand of appellant's wife, thus making the object of the killing revenge. Nothing more or less, according to his own words. This statement also flatly contradicts appellant's other statement upon which the majority opinion is based in that it shows that appellant did intend to shoot Rider when he entered the church and later carried out his purpose as planned on scheduled time. Appellant's own words spoken at the time of the shooting convicts him of wilful murder.

In spite of this, however, the majority opinion undertakes to lay down the rule that under such facts and circumstances appellant was entitled to an instruction upon the law of voluntary manslaughter and that appellant's rights have been prejudiced by failure to give such an instruction. Inasmuch as he made no claim that the deceased Rider was about to harm him or that he shot in defense of himself or another, an instruction upon the crime of manslaughter could not have been warranted upon the ground that appellant shot in sudden affray; and inasmuch as appellant had been seeing his victim frequently from the time he charges Rider invaded his home some year or more before up to the time of the shooting, the killing could not, under any pretense, be excused or the crime mitigated in any measure upon the ground of sudden heat of passion. Cases are frequent where an instruction upon the law of manslaughter based upon sudden heat of passion is justified. For instance,

if a husband should suddenly learn for the first time that his wife had been assaulted or debauched by a named person, and before he had time to think or cool his anger he should come into the presence of the alleged perpe-. trator of the crime and shoot or otherwise kill him, he would have grounds to ask an instruction upon man-slaughter. There is, however, no case on record where one charged with murder under circumstances similar to those proven in this case and where as much as a year had elapsed between the happening of the occurrence and the killing, and where the killer had seen and talked to his victim on different occasions between the time of the alleged original offense and the firing of the shot, that an instruction upon sudden heat of passion, warranting a reduction of the punishment from murder to that of manslaughter, was given. A killing like the one under consideration is conceived in malice—where the killer has deliberated over the matter for weeks and months—and cannot be committed without malice aforethought, and in every such case the crime is and could only be wilful murder.

Turning now to his sole defense upon the trial, "in-sanity and irresistible impulse to kill," let me say that there is no rule known to the law by which one may re-duce murder to manslaughter upon either of these pleas. If, as contended by appellant, he killed his victim at a time when he was suffering from "acute mania" then he was not guilty of any crime at all, for he could not, in contemplation of law, have entertained malice. Such a plea is never offered in mitigation of crime and is always held to be a complete defense. It can be nothing less. If the accused was so unsound of mind as not to know or understand the nature of the crime he was about to com-mit he is not responsible in law and must be acquitted, and this is true whether it be an irresistible impulse to kill or acute mania, or any other form of mental un-soundness which renders him unable to determine right from wrong or incapable of controlling his actions. No less an authority than Corpus Juris, in its text upon Cri-minal Law, vol. 16, page 98, says:

"Of course no one can be held responsible for, or even guilty of, a crime unless he has sufficient capacity, mentally and otherwise, to commit it. Want of capacity therefore is *a complete defense and not merely a mitigating circumstance.*"

What could be plainer than this, and it is the acknowledged law supported by many decisions of courts. So we see that mental incapacity to commit a crime is not a mitigating circumstance but a complete defense. In the case of Sage v. State, reported in 91 Indiana 141, it is said:

"The term 'insanity' therefore, under the statutes of this state, includes every species of organic mental derangement, whether of a mild or violent form, and excludes every other condition of the mind. It follows that there is, in our state, no middle ground between 'sanity' and 'insanity,' and that as regards their mental condition, in those respects, we have but two classes of people, the 'sane' and the 'insane.' Actual insanity, however partial it may be, is, consequently, with us a defense and not a mitigating circumstance, in a prosecution for a crime." Fritz v. State, 178 Indiana 463.

As further showing that insanity is a complete defense and not a mitigating circumstance warranting the giving of an instruction on manslaughter, we quote from Rose's Kentucky Criminal Law, as follows:

"Where insanity is pleaded as a defense it is proper for the court to tell the jury that if the defendant's mind was so feeble as not to enable him to know right from wrong, or to discriminate between the two, or if he did not have sufficient will power to control his actions by reason of mental infirmity or weakness, the *defendant should be acquitted.* Graham v. Com., 16 B. M. (Ky.) 587; Shannahan v. Com., 8th Bush 463; Farris v. Com., 8 R. 417."

The same text, page 2, *et seq.*, contains a very full discussion of the subject.

In Judge Gregory's Kentucky Criminal Law and Procedure, page 18, it is said:

"It is well settled in Kentucky, that if one at the time of the act complained of, was without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong, or that as a result of mental unsoundness he had not then sufficient will power to govern his action by reason of some insane impulse which he could not resist or

control, *he is not criminally answerable for his conduct.*"

And in support of that statement is cited the cases of Abbott v. Com., 107 Ky. 624; Banks v. Com., 145 Ky. 800; Babey v. Com., 169 Ky. 735; Hall v. Com., 155 Ky. 541. The criminal responsibility of those who are of unsound mind is discussed by the learned author, beginning on page 16 of the same book to which we have referred, the import of which is, that insanity is a complete defense and not receivable in mitigation of the crime of murder.

On page 32 of Roberson's Ky. Criminal Law will be found a discussion of the effect of a plea of insanity in a criminal case, the learned author saying: "If there be either incapacity to distinguish between right and wrong as to the particular act, or delusion as to the act, or inability to refrain from doing the act, there is no responsibility." See also Bishop's New Criminal Law, page 245; and Bishop's New Criminal Procedure, vol. 2, page 296.

In the case of Kriel v. Com., 5 Bush 365, we held that a "mere doubt of sanity can never enter as an element into the reasonable doubt which should produce acquittal." We have also laid down the rule that where the defendant's mind was free from disease, then no impulse to shoot the deceased, no matter how violent and no matter how completely it dominated his will, was unsoundness of mind so as to excuse the homicide. McCarty v. Com., 114 Ky. 620, 71 S. W. 656.

Every approved instruction on insanity in a criminal case directs the acquittal of the defendant and not a lessening of the punishment. See Hobson on Instructions, pages 938, 939 and 940.

It is a rule well established in this jurisdiction that an instruction upon manslaughter should not be given where there is no evidence of manslaughter. An instruction on manslaughter in a case like the one under consideration where there are no mitigating circumstances and no evidence that the killing was in self-defense or in sudden heat of passion or sudden affray, would be erroneous and prejudicial to the rights of the Commonwealth. We so held in the case of Johnston v. Com., 170 Ky. 766, wherein it was said:

"As will be seen, there was no evidence either of manslaughter or self-defense . . . It therefore

results that the giving of the manslaughter instruction, to which appellant objected, was erroneous, and that the jury found the appellant guilty under an erroneous instruction of a crime that was not proven by the testimony is conclusive that the giving of the instruction was prejudicial.''

In the case of Harris v. Commonwealth, 183 Ky. 542, it was contended by the accused that he did not consciously kill his victim; that at the time he killed her he did not realize what he was doing and in fact did not know what he had done until afterwards. In that case, Harris' contention is exactly the same as appellant Vaughn's contention is in this case. The cases are very similar in many of their features. Harris was drinking and also claimed insanity and irresistible impulse to kill. In this case Vaughn claims insanity and irresistible impulse to kill; he was also drinking. In discussing the theory of the defense and the nature of an instruction which should have been given by the trial court in the Harris case, we in part said:

"Drunkenness was at common law no excuse or of any benefit whatever to one accused of homicide, and it is everywhere written in the law of today that it is no excuse for or palliation of crime (13 R. C. L. 715). Yet its use as a defense, where motive is an essential ingredient of a crime, it permitted quite generally in a very confused and ununiform way, purely as a result of judicial effort to reduce the harsh rigor of the common law rule to accord more nearly with reason and human experience, and as a consequence upon trial for murder, drunkenness as affecting motive is admitted as a *pro tanto* defense, but as this ameliorated rule has no support except judicial reasoning, it logically must be limited by reason and ought to be applied only as logic supports its application.''

Further along in the same opinion we said:

"Where a man though drunk hunts down and kills, not at random, but his enemy, drunkenness explains nothing not perfectly comprehensible under the ordinary laws of human conduct. The very fact of selection destroys utterly any reasonable deduction of a want of motive or of any motive but malice, and the selection is explained beyond a reasonable

doubt by the normal state of mind and not in any sense dependent upon or affected by intoxication; there is left no possible place for any consideration or speculation as to the effect upon the mind of the intoxicant."

The facts in the Harris case, *supra,* are so similar to the facts in this case as to make it appear that the legal conclusions and deductions stated in that opinion drawn from the evidence in that case were prepared especially for this case.

One cannot claim mitigation of punishment in a homicide case on the ground of "heat of passion" which was wholly unprovoked. Heat of passion does not mean passion or anger which comes from an old grudge or cause or provocation not immediate; but passion or anger suddenly aroused at the time by some *immediate* and *reasonable provocation,* by *words or acts committed* or done at the time, so it was held in State v. Seaton, 106 Mo. 198. One who in possession of a sound mind commits a criminal act under the impulse of passion or revenge, though it may temporarily control his will or dethrone his reason, cannot be shielded from the consequences of his act. Williams v. State, 50 Ark. 517, 9 S. W. 5; Com. v. Renzo, 216 Pa. 147.

The term "sudden passion," in a charge defining manslaughter as voluntary homicide committed "under the immediate influence of sudden passion" arising from an adequate cause, means that the provocation must arise at the time of the killing and that the passion is not the result of former provocation, and the act must be directly caused by the passion arising out of the provocation, if any, at the time of the killing. It is not enough that the mind is merely agitated by passion arising from other provocation or a provocation given by some person other than the party killed. Stell v. State (Tex.), 58 S. W. 75, 76; Farrar v. State, 15 S. W. 719, 720, 29 Tex. App. 250; Lowe v. State, 70 S. W. 206, 207, 44 Tex. Cr. R. 224.

Murder is the unlawful, wilful killing of a human being with malice aforethought, not in necessary self-defense.

A homicide which would otherwise be murder, if committed without malice aforethought, *i. e.,* in self-defense, or in sudden heat of passion or sudden affray, can be nothing more than manslaughter, but, as admitted in

this case, there can be no manslaughter unless the killing was done in sudden heat of passion or sudden affray.

The common law defines an affray as being the fighting of two or more persons in a public place to the terror of the people. A sudden affray is one which arises quickly and unexpectedly before one has time to think or cool his anger. So then to reduce a homicide to manslaughter the killing must have been the result of a fighting, or some open violence. Violett v. Comth., 24 R. 1720. In the case of Helm v. Com., 156 Ky. 751, we laid down this definition: "Voluntary manslaughter is the unlawful killing of another intentionally, *but in sudden heat of passion due to adequate provocation* and not with malice." As stated in Bishop in his work, New Criminal Law, p. 398 (Book X): "To negative malice, it must be sudden and on *reasonable provocation,* and it must proceed from what the law deems *adequate* cause. In other words, where there is no evidence of premeditation or other proof of malice, proof of *reasonable* and *adequate provocation* will negative malice, and *entitle accused to the benefit of an instruction on manslaughter.*" The converse would seem to be true. Admittedly there was no affray in the killing of Rider.

The meaning of the expression "sudden heat of passion" was defined by this court in the case of Metcalf v. Commonwealth, 86 S. W. 534, 27 R. 704. It is also defined in Bouvier as meaning "passion or anger which does not arise from an old grudge but from *immediate cause or provocation.* It means passion or anger suddenly aroused at the time by some *immediate* and *reasonable provocation,* by words or acts of one at the time." One of the cases cited under the definition in Bouvier, says:

"One who in possession of a sound mind commits a criminal act under the *impulse* of *passion* or *revenge,* though it may temporarily control his will or dethrone his reason, *cannot* be *shielded from the consequences of his act.*"

The mere act of looking at another does not justify the taking of life, even though the look be from the corner of the eye, or from "under the corner of his eyes," as stated by Vaughn, unless accompanied by some word or act reasonably calculated to arouse the passion or produce an affray.

The court gave to the jury an instruction on the law of murder, and, as we have seen, appellant Vaughn's

crime is murder or nothing. He also gave the jury an instruction directing it to find appellant not guilty if it believed from the evidence that appellant was of unsound mine. This last instruction was as plain and clear as words could make it, and reads:

"If the jury believe from the evidence that at the time the defendant shot and killed Robert Rider he was of *unsound mind then you should acquit him.*"

The words "unsound mind" are broad enough to include every phase of mental disease or derangement. Nor did the court attempt to restrict the jury in case it believed from the evidence that appellant was only partially insane. The instruction directed the jury to find him not guilty if it believed from the evidence that he was of unsound mind. After hearing all the evidence the jury answered with its verdict that it did not believe him to be of unsound mind. The court further instructed the jury that the law presumes every man sane until the contrary is shown by the evidence, and before the defendant can be excused on the ground of insanity the jury must believe from the evidence that the defendant was, at the time of the killing, without sufficient reason to know what he was doing, or had not sufficient reason to know right from wrong; or that as a result of mental unsoundness he did not *have sufficient will power to govern his actions by reason of some insane impulse which he could not resist or control.* It will be observed that the court told the jury, in substance, that if it believed from the evidence that Vaughn "had not sufficient will power to govern his actions" he was of unsound mind within the meaning of the instruction, and that the jury must acquit him. It does appear that the court gave the appellant every advantage known to the law. This last instruction takes care of every kind of mental disorder, including "irresistible impulse to kill," the jury being told that if it believed from the evidence that appellant Vaughn had not sufficient will power to govern his actions that he was entitled to an acquittal, and this is the law whether we agree with it or not; but it is not now and never was the law that unsoundness of mind on the part of the person committing crime is a *mitigating circumstance* which entitles him to an instruction upon manslaughter in cases of homicide.

On the contrary, all the texts as well as all court opinions of this and other jurisdictions are to the effect that mental unsoundness is a *complete defense* to the charge. It is based upon the idea that there can be no crime without criminal intent, and as a person of unsound mind can entertain no intent he can commit no crime however destructive his act may be.

Appellant relies upon the case of Shipp v. Commonwealth, reported in 124 Ky. 643, as authority for an instruction upon manslaughter in a case of this nature. The facts in that case were very different from the facts in this case. There Shipp not only insisted that his victim had debauched his wife, as in this case, but he claimed that his wife confessed to him on Saturday that she had been intimate with the man he killed on Monday. As soon as Shipp learned of the infidelity of his wife he immediately left his home at Campbellsville and went to Phillipsburg. He had not seen Smith, whom he later killed, from the time he received the confession of his wife until he walked up and shot him. The instruction in that case was given upon the theory that the shooting was done in *sudden heat of passion* caused by the recent confession of his wife, all of which was fresh in his mind when Shipp, for the first time, looked upon his victim, the man with whom his wife had confessed, only a few hours before, she had been intimate. But for the suddenness of the affray—the sudden heat of passion which overcame Shipp when he saw for the first time the debaucher of his wife—the court would not have approved or allowed an instruction upon manslaughter in that case. But to my mind that case is entirely outside the law. There was no warrant whatever even in that case—a much stronger one than this—for an instruction upon the law of manslaughter. The opinion was not well considered, especially so with respect to the manslaughter instruction directed to be given on page 661, wherein it employs the conjunction "and" between the phrase "sudden heat of passion" and "under such provocation that was ordinarily calculated to excite passion beyond control." Certainly heat and passion were enough to warrant the giving of the instruction without adding "under such provocation that was ordinarily calculated to excite passion beyond control," and *vice versa.* The directed instruction was itself obviously erroneous. That case should be overruled before it induces other crimes

and brings about greater injustice. In that case, as in this, the man wielding the gun undertook to shield himself from the just penalties of the law by relying upon what he and his counsel were pleased to term the "unwritten law." The so-called unwritten law is no law at all, but rather lawlessness. It is the excuse offered by men when they have no other defense in homicide cases. If "A" quarrels with "B" on Saturday and the two become embittered at each other but separate without fighting and brood over the matter until Monday, at which time "A" hunts up "B" and shoots him to death at a time when "B" is not aware of the presence of "A," it is always held to be murder, and this, too, though in the original quarrel "B" was in the wrong and "A" was right. So if Rider in this case actually did the things of which Vaughn accused him, and Vaughn's wife some months before confessed to him that she had been intimate with Rider, and thereafter Vaughn saw and talked to Rider concerning the matter and later brought suit against him for damages for alienating the affection of his wife and also brought suit for divorce against his wife, and the matter dragged along from week to week and from month to month, with the two men in the same village and frequently coming face to face, the killing could not be said to have been the result of sudden heat of passion or sudden affray; and as it admittedly was not self-defense, there was no ground upon which an instruction upon the law of manslaughter could have been properly given to the jury in the case.

The only other complaint on which appellant relies for a reversal of the judgment is a statement made by counsel for the Commonwealth in the argument of the case to the jury wherein he said:

"Remember this, gentlemen of the jury, get this out of your head for a minute—remember you are trying Robert Rider, too; whenever you come in, gentlemen, and say in this case 'not guilty' remember you are putting the stigma of guilt upon an assassinated citizen, and you are putting that stigma of guilt upon that man without an opportunity to be heard in a court of justice."

In the heat of argument counsel in criminal cases sometimes go the limit. Inasmuch as appellant Vaughn was urging that the deceased Rider had brought about all the trouble by ingratiating himself into the af-

fections of Mrs. Vaughn, I think the statement made by counsel to the jury: "You are trying Robert Rider, too," was not at all out of place, and entirely to the point. I have no doubt that in argument of the case for appellant, counsel insisted that Rider had invaded the home of Vaughn and this precipitated the trouble; that Rider was wrong and Vaughn was right, and no doubt his argument tended to impress upon the minds of the jury the fact, and it was a fact, that they were in a large measure trying Robert Rider. Such argument having been made upon the part of appellant, why was it improper for the attorney for the Commonwealth to say to the jury, "You are trying Robert Rider, too?" It was also true, as counsel stated to the jury, that if they came in with a verdict of "not guilty" that such a verdict would place a stigma of guilt upon Robert Rider, the assassinated citizen, without him having an opportunity to be heard. Such deductions and arguments are not out of place if they are in response to argument of counsel for the accused asserting the contrary. I therefore attach but little importance to this isolated extract from the address of the attorney for the Commonwealth.

To my mind a reversal of this judgment is without justification or excuse. It seems like an invitation to the crime of murder to become more frequent. Already life is too cheap. Murder is abroad in the land and the more courts quibble about the unimportant things in homicide cases, the more crimes of like nature will be committed and the more quibbling will be necessary. What we need in this country as a check upon crime is a strong, wholesome administration of speedy justice, and a quick rejection of unfounded defenses which delay trials and impede the course of justice. We give too much attention to alleged errors on appeals which have no substance or merit. Until we inject a greater measure of common sense into the consideration of such cases and, rising to higher planes, begin to administer justice in its purity and strength, disregarding the quibbles and foibles of lawyers and the law, and to bring about speedy trials and certain infliction of adequate penalties, we may expect the crime wave not only to continue but to augment and become yet more terrible.

Believing that appellant Vaughn received a fair trial, and that it was not error on the part of the court to refuse to give an instruction on manslaughter and that the judgment should be affirmed and Vaughn re-

quired to suffer the penalty fixed by the jury—a light one, the facts considered—I most respectfully dissent from the majority opinion.