## Lindsay v. Commonwealth.

(Decided October 4, 1929.)

R. MONROE FIELDS for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, Jr., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At his trial in the Letcher circuit court under an indictment charging him with murdering his brother, Chaney Lindsay, the appellant, N. R. Lindsay, was convicted of voluntary manslaughter and punished by confinement for a period of 18 years in the penitentiary. By this appeal he seeks a reversal of the judgment overruling his motion for a new trial, and through his counsel urges as errors sufficient therefor: (1) That the verdict is flagrantly against the evidence, and (2) improper instructions of the court to the jury, each of which will be considered and disposed of in the order named.

1. A substantial statement of the testimony heard upon the trial is necessary to the determination of ground 1. Both appellant and the deceased lived but a short distance apart in Haymond, a mining town, in Letcher county; the space between their homes being occupied by dwellings of other inhabitants of the village. The homicide was committed in the residence of the deceased, and no one was present except defendant, deceased, and the latter's wife. It occurred in the daytime and a short time before April 12, 1922, on which date the indictment was found. Defendant, about five hours after the killing, was found and arrested in an outhouse about half a mile from his brother's residence. After the indictment, and while he was incarcerated in the jail in Whitesburg, the county seat of Letcher county, he made his escape and was a fugitive for some five or six years, when he was apprehended in Chattanooga, Tenn. He was arrested before that time in Birmingham, Ala., but he instituted habeas corpus proceedings and succeeded in preventing his return to Kentucky. He resorted to the same remedy when he was last arrested in Chattanooga, but was unsuccessful.

About 9 o'clock on the morning of the day of the homicide, defendant, Tolby Combs, and another met at the residence of a Mr. Garrett, at which place there was whisky that had been procured by Combs; but defendant and the two others, according to the evidence, contributed and made up the price paid for the whisky. Thereafter defendant returned to his home and engaged in a quarrel with his wife and in which he created a considerable disturbance in the immediate neighborhood. Austin Collins, who was well acquainted with defendant, was appealed to by Mrs. Lindsay, or some of the neighbors, to

use his influence in quieting defendant, and Collins went to the latter's residence for that purpose. He found him lying on the bed apparently asleep, with an automatic shotgun between his legs, which Collins removed and deposited it in a secret place upstairs. Collins had with him his brother, and a short while after the shotgun had been so taken and hidden defendant awoke and inquired of the witness as to the whereabouts of the shotgun, and he was informed what had been done with it; whereupon he drew from his person, or from under the cover of the bed, a pistol and fired three or four shots through the ceiling of the room, and then immediately pointed the pistol at the brother of witness, who ran away around the house; but the witness, who had followed his brother, went back to the porch of defendant's residence, and as he attempted to open the door the defendant was doing the same thing, and he then had not only his pistol but had sought out and obtained the hidden shotgun, which he also had. He then pointed his firearms a number of times at the two Collinses, who were endeavoring to persuade him to desist from his conduct; but he would not allow either of them to come near him. However, Austin Collins finally succeeded in obtaining the pistol and laid it on the mantle, but defendant, who was then lying down on the bed, got up and put on his overcoat and took the pistol and his shotgun and started upstairs in his residence, when witness and his brother left.

In the meantime W. H. Caudill, an officer in the village, heard of the rampage being staged by defendant, and he with one Yonts started to his residence to make an investigation. When they were within about 100 yards of defendant's residence, they heard some one whom they had not theretofore seen ask: "Where are you fellows going?" Upon looking they discovered that the speaker was the defendant and he had the shotgun leveled at the officer. He made the latter disarm himself and drove Yonts from the scene, and during the time of that brief meeting defendant performed many terrorizing and unlawful acts, among which was the firing of the shotgun in the ground near the officer's feet. When the officer threw his pistol on the ground, defendant picked it up and removed from it all of the loaded cartridges therein; but at the time he departed from the presence of the officer, who could not get near enough to him to arrest him, he delivered back to him his empty pistol and also some of the loads that he had taken therefrom. During that

same meeting defendant informed the officer that he was going to his brother's and get the latter's high-powered rifle and then leave town; but he warned the witness that, "If you follow me I will kill you," and he instructed the officer to tell designated others not to follow him upon penalty of death if they did so.

The officer retired to his home, and while pondering as to what should be his course, he heard some shots in the direction of the residence of the deceased. Witness then proceeded to load his pistol with a view of investigating, but before he sufficiently armed himself, as he thought, defendant passed by his house, but when witness opened the door he did not see defendant, who had gone up the road out of sight. He was later found and arrested and stated at the time, after something had been said about his shooting his brother, that, "No damn man could hit him over the head with a chair and get away with it."

Mrs. Lindsay, the widow of the deceased, testified as to what occurred at the immediate time of the homicide and said that: "He (defendant) came into her house and got Chaney's high-powered rifle gun and was in another room getting shells for it and my husband came in the room and tried to take it away from him and he begin shooting him and shot him until he fell down." She later stated that the defendant fired four shots into the body of his brother, three of which were in rapid succession, and the last of which followed a short pause between it and the others, and that defendant, after his brother had fallen to the floor, looked into his face and left the house carrying with him the rifle of the deceased; but the shooting was done with a pistol. On cross-examination she was asked if there had been any previous trouble between defendant and his brother, and she answered: "Not that I knew about, only Chaney (deceased) had been working with Mr. Caudill and he (defendant) said that he was aggravated because Chaney was a friend of Mr. Caudill." The evidence further discloses that the relations between defendant and his brother were cordial and marked by the same friendliness and affection ordinarily existing between brothers. The wife of Austin Collins testified that after the shooting defendant came to her house and inquired for her husband, and then inquired for his wife, neither of whom was there, and that defendant then exclaimed, "Lord have mercy, Mrs. Collins, I have killed Chaney!" and then left her premises.

Defendant testified that he had been waiting upon his brother and other members of his family who were afflicted with influenza; that he had lost much sleep; and that his brother on the day of the homicide had sufficiently recovered to be able to sit up, and was on his porch the morning of the fatal day when defendant called upon him. He said that his brother then told him that he needed rest and advised him to procure some whisky, which the brother suggested would prove beneficial; that later in the day he found Combs' and another, who had the whisky, and the three of them consumed it, but that it was only a small quantity. What happened thereafter is thus stated by him: "I went on out (from the room in which the whisky was drunk) and went back to the house and aimed to kill a hog that morning, had a hog already penned up and I wanted to kill the hog and went to the house and told my wife to go to the commissary to get some salt I was going to kill the hog and she said all right so she didn't start right then and I went out in the back yard and went and piled up bricks about the pot and got it filled up filled up my tub and went back and spoke to her and says honey you aint kissed me this morning and she says no, says I ain't got no time to kiss you, I says what is the matter, she says I have to give all my sugar to my sweetie and I turned around and went in the house and I says come and set down on my lap and kiss me, you haven't kissed me this morning and she says I told you out there I give all my sugar to my sweetie, I have been down setting in his lap, and that is the last I remember, seem like the top of my head went off my shoulder and I don't remember no more until the next I remember that morning they brought me to Whitesburg, started to Whitesburg, seem like my faculties begin to get together, like my mind was in a conglomeration like I could see people up in front of me but it appeared they were around me and seemed like it was strange people all standing behind me and that is when I begin to come to myself."

There was testimony upon collaterally material facts, among which was the bad reputation of defendant for peace and quietude when drinking, but what we have stated includes all of the testimony touching the salient and material facts and upon which the insistence is made the verdict is flagrantly against the evidence, i. e., that it is insufficient to refute the only defense relied on, which was temporary insanity. It is true that some of

the witnesses testified that defendant from the time he was first seen in his residence by Austin Collins had a glaring appearance in his eyes; but whether it was due to intoxication the witnesses were unable to state. Some of them, however, did say that he acted with apparent good judgment in performing the stunts that he pulled off. None of them stated that his condition was not due to intoxication. The extent that any of them went, in giving their testimony upon that phase of the case, was that they did not know what was the matter with him, or what produced his condition, or whether or not he was intoxicated. He intimates in his testimony, followed by a similar insinuation in brief of his counsel, that the whisky produced by Combs, a part of which defendant drank, was "doped," and because thereof he became temporarily beside himself, but there was no testimony in support thereof.

In view of all of the testimony as above outlined by us, including his escape from jail and resisting a return to this jurisdiction and the fact of his hiding himself from the officers, it is perfectly manifest that the contention forming the basis of this ground cannot be upheld, and for that reason it is denied.

2. The argument in support of ground 2 is directed to a criticism of instructions Nos. 4, 5, and 6, and which were and are in these words:

"No. 4. If the jury should find from the evidence that the defendant did shoot and kill Chaney Lindsay, but at the time he did so the defendant did not have mental capacity sufficient to enable him to know and understand that it was wrong to shoot said Chaney Lindsay the defendant was of unsound mind; or if defendant did shoot said Chaney Lindsay and at the time he shot him the defendant was prompted to do such shooting by an impulse resulting from a diseased mind of such violence that it overcame the will of the defendant and constrained him to shoot the said Chaney Lindsay, when he did not wish to shoot him, the defendant was of unsound mind and in either event the defendant would not be responsible for his act, and the jury should acquit him.

"No. 5. If the jury should believe from the evidence that at the time the defendant shot and killed Chaney Lindsay, if he did so, the defendant had

mental capacity sufficient to enable him to know right from wrong and if at the time he had will power sufficient to enable him to choose between shooting and refraining from shooting the said Chaney Lindsay, the defendant was of unsound mind and if the defendant did shoot Chaney Lindsay, and at the time he did so, the defendant had mental capacity sufficient to enable him to know right from wrong, and if his mind was free from disease, then no impulse to shoot the said Chaney Lindsay, no matter how violent and no matter how completely it dominated the will of the defendant was unsoundness of mind. The law presumes every man sane until the contrary is shown by the evidence.

"No. 6. The court further instructs the jury that although they may believe from the evidence that the defendant, at the time of the killing of Chaney Lindsay, had not sufficient reason to know right from wrong or was without sufficient power to govern his action by reason of some impulse which he could not resist or control, yet if they further believe from the evidence beyond a reasonable doubt that such lack of reason to know right from wrong or such insufficient will power to govern his actions or to control his impulse, arose alone from voluntary drunkenness, then existing, and not from unsoundness of mind, they should not acquit the defendant on the ground of insanity or unsoundness of mind.''

As we understand counsel, he does not object to the criticized instructions because they do not embody the correct legal test of responsibility for the commission of the crime, or that they do not correctly define the extent of insanity (either temporary or permanent) that would excuse one in the commission of a crime; but he does seriously contend that the instructions were not in proper form and that they should have been constructed after the manner of those contained in the case of Abbott v. Commonwealth, 107 Ky. 624, 55 S. W. 196, 21 Ky. Law Rep. 1372, and that the failure to do so was fatal. We cannot agree with that contention. Instructions substantially the same as the criticized ones in this case were approved by us in the cases of Smith v. Commonwealth, 1 Duv. 224; McCarty v. Commonwealth, 114 Ky. 620, 71 S. W. 656, 24 Ky. Law Rep. 1427; Hall v. Commonwealth, 155 Ky. 541, 159 S. W. 1155, 1156; and Berry

v. Commonwealth, 227 Ky. 528, 13 S. W. (2d) 521. Those cases hold that all that is required in the submission of the insanity defense is that the instructions shall contain the true test of insanity that will excuse the defendant from punishment for his crime.

In answering the criticism to similar instructions in the Hall case we said: "It will be observed, however, that under the instruction given by the court, it met the requirements of this test, for it authorized the jury to acquit if they found he did not have mind enough to know right from wrong, or by reason of mental unsoundness did not have will power sufficient to govern his action. The court by this instruction, in further saying to the jury that they might acquit if they found he was without sufficient mind or reason to know what he was doing, was merely giving to the jury an additional ground to acquit him." The instructions in this case submitted the test as laid down in the cited cases, and in instruction No. 6 the court submitted to the jury the approved rule in this jurisdiction to the effect that temporary insanity or dethronement of reason produced by voluntary intoxication cannot be relied on by defendant. There was ample evidence to authorize that instruction, and we have not been convinced, nor have we been able to find sufficient grounds for holding, that it was improper or that the court erred in giving it.

The evidence, as we have seen, discloses that defendant and his brother became involved in some kind of an affray over the latter's rifle and engaged in a scuffle or fight. Something may have happened there to reduce the crime from murder to manslaughter, but, if not, then the defendant should congratulate himself upon the mildness of his punishment.

Without further comment, we are convinced that the substantial rights of defendant were not prejudiced at his trial, and the judgment is affirmed.