WILLIAM O. MARTIN, Plaintiff in Error, vs. SARAH A. BEATTY et al. Defendants in Error.

*Opinion filed June 21, 1912.*

1. WILLS—*when the issue of undue influence is properly taken from the jury.* The issue of undue influence in a will contest case is properly taken from the jury where the evidence shows that the testator came alone to the scrivener and directed the drawing of the will, and that no one was present at its execution except the testator, the scrivener and the attesting witnesses, who were disinterested persons.

2. SAME—*issue must be fairly presented where evidence is in irreconcilable conflict.* Where the evidence upon the question of the testator's mental capacity is in irreconcilable conflict it is important that the trial should be so conducted that such issue shall be fairly presented to the jury.

3. SAME—*when it is error to refuse to admit testimony that the testator's near relatives were insane.* In a will contest case, if there is testimony tending to show that the testator was lacking in mental capacity, it is reversible error to refuse to permit witnesses to be asked whether two sisters and a nephew of the testator had not been insane.

4. SAME—*whether a non-expert is qualified to give opinion on the testator's mental condition is for the court.* Whether a non-expert witness has sufficient knowledge of the testator to express an opinion as to his mental condition is a question to be determined by the court, but there can be no fixed rule laid down declaring the extent of acquaintance or opportunities for observation which will qualify a witness to express such an opinion.

5. SAME—*opinion of non-expert witness is to be taken by the jury for what it is worth.* A non-expert witness in a will contest case may, if qualified to testify, state facts and circumstances from which the jury may form an opinion as to the testator's mental condition, and he may then give his own conclusion in the form of an opinion, which is to be taken by the jury for what it is worth.

6. SAME—*declarations of testator in conflict with will are not admissible.* Declarations by the testator to the effect that he intended to make a disposition of his property in a manner different from that made by the will are not admissible.

7. SAME—*when instructions as to degree of mental power necessary to make a will are not incorrect.* Instructions in a will contest case which state that the testator was of sound mind and

memory, within the meaning of the law, if he had sufficient mind and memory "to know and understand what disposition he was making of his property" when he executed the will, are not incorrect because they do not require him to understand the extent of his property devised and the nature of the claims of others on him.

WRIT OF ERROR to the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding.

DEMANGE, GILLESPIE & DEMANGE, and LESLIE J. OWEN, for plaintiff in error.

WELTY, STERLING & WHITMORE, and EARL D. RIDDLE, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error filed a bill in the circuit court of McLean county to set aside the last will and testament of his uncle, James H. Martin, who died at Leroy, in said county, August 1, 1910. The bill charged that the testator was of unsound mind and was unduly influenced in the execution of the will. The court instructed the jury that there was no evidence of undue influence. The jury found that said writing was the last will and testament of James H. Martin, and a decree was entered in accordance with such finding. To review that decree this writ of error has been sued out.

The deceased was a bachelor, and left him surviving as his only heirs-at-law, Willett L. Martin, a brother; two sisters, Martha J. Arrowsmith and Sarah A. Beatty; three nephews and a niece, William O., Edward and Roy E. Martin and Mary Leta Caven, children of a deceased brother; and a niece, Mary Corthon, daughter of a deceased sister. The testator inherited 168 acres of valuable land in McLean county and had purchased 88 acres additional. He also left between $12,000 and $15,000 in personal property. The will was drawn in 1903. To his niece Mary Cor-

thon he left $500, and to his nephews William, Edward and Roy and his niece Mary Leta Caven he left $100 each, the residue being divided equally among his two sisters and his brother. Some years before his death he had made an agreement with the son of one of his sisters, by which, in consideration of receiving his board, care and nursing for life, he was to give $800 annually and at his death certain town lots.

The will was drawn at the office of C. A. Barley, a real estate and insurance agent who had for years done business for the testator in procuring loans, drawing leases, etc. None of the legatees in the will were present, or, so far as the record shows, had anything to do with suggesting its terms. It was witnessed by Barley and Arthur J. Keenan, president of a bank in Leroy, who was called in for that purpose after it was drawn, only the testator and the two witnesses being present at the time the will was executed. Barley testified that the testator gave directions as to the disposition of his property without any suggestions from anyone. The undue influence which will avoid a will must be directly connected with the execution of that instrument and be operating when it is made. (*Larabee* v. *Larabee,* 240 Ill. 576; *Wickes* v. *Walden,* 228 id. 56; *Snell* v. *Weldon,* 239 id. 279.) There is not the slightest evidence in this record to indicate any undue influence in the execution of this will. The court therefore rightly instructed the jury not to consider that question.

As is usual in cases of this character, the evidence as to the testator's mental capacity was conflicting. About seventy-five witnesses testified on that issue,—some forty-seven for the defendants in error and something over half that many for plaintiff in error. A number of these witnesses did not attempt to testify as to the testator's mental condition at or about the time the will was made. The testimony shows, beyond controversy, that Martin had carried on his farm and had loaned and collected money and

transacted other business for many years before he made his will but that he had grown physically weaker with advancing years; that he had what some of the witnesses called palsy or shaking palsy. Some of the witnesses said this physical weakness began before he made the will, and others did not notice it until after the date. Some testified that they had met him on the street and though they had known him for years he would not respond when spoken to; that he had a vacant stare or blank expression on his face. Several also testified that they had known of his falling down and requiring assistance to regain his feet; that he would stand with his mouth open. One or two witnesses testified he had been lost on the street and had to be directed to his home in Leroy. As the case must be reversed for errors of law we do not deem it proper to discuss the weight of the evidence, except to say that it was so irreconcilably conflicting in its character upon the mental capacity of the testator that it was important the trial be so conducted that that issue should be fairly presented to the jury. *Craig* v. *Southard,* 148 Ill. 37.

Several witnesses were asked if two brothers, two sisters and a nephew of the testator had not been insane. The court refused to admit this testimony. We held in *Dillman* v. *McDanel,* 222 Ill. 276, that if there is evidence tending to show mental unsoundness, it is competent to show the insanity of a testator's collateral blood relations no further removed than uncles and aunts without making proof that it was hereditary in character, citing many authorities in support of this conclusion. Much of the testimony on behalf of the plaintiff in error tended to show mental unsoundness of the testator. The evidence in question came squarely within the rule laid down by this court in the case just cited. (See, also, to the same effect, Underhill on Wills, sec. 103; 22 Cyc. 1117.) It must be assumed, for the purpose of this ruling, that two brothers, two sisters and a nephew of the testator had been insane. What in-

fluence this testimony, if admitted, would have had on the jury cannot be told. In view of the other testimony in the record it might have been a deciding factor. The court committed reversible error in not admitting this evidence.

Plaintiff in error contends that the court erred in excluding the opinion evidence of certain witnesses as to the testator's mental condition. Whether a non-expert witness has sufficient knowledge of another to express an opinion on his mental condition is to be determined by the court. A witness who is not an expert may detail facts and circumstances from which the jury may form an opinion and then give his own conclusion in the form of an opinion. (*Graham* v. *Deuterman*, 244 Ill. 124.) This opinion is to be taken by the jury for what it is worth. (*Snell* v. *Weldon, supra.*) From the nature of things no rule can be laid down declaring the extent of the acquaintance or the opportunities necessary to enable an observer to be a witness. "There are cases of insanity open to the slightest scrutiny while others defy the keenest search, but no testimony can be of any real value unless it appears that the witness had adequate means and opportunities for forming such conclusion." (*Beaubien* v. *Cicotte*, 12 Mich. 459; *Ring* v. *Lawless*, 190 Ill. 520; Jones on Evidence,— 2d ed.—sec. 364; Page on Wills, sec. 390.) While, under the rules for the admission of this class of evidence, the trial judge may have too greatly restricted the examination of certain witnesses as to the testator's mental capacity, we are not disposed to hold that he committed reversible error in this regard.

Plaintiff in error further contends that he should have been permitted to show that the testator had told certain witnesses that he intended to give his property "equally to all my relatives." The only effect of that testimony would be to show an intention to distribute the property in a different manner from that provided in the will, and for

that purpose it was not admissible. *Waters* v. *Waters,* 222 Ill. 26.

It is further insisted by plaintiff in error that the court improperly gave several instructions for defendants in error which in substance stated that if the testator had sufficient mind and memory "to know and understand what disposition he was making of his property" when he executed the will, then he was of sound mind and memory within the meaning of the law. It is complained that these instructions leave out the element that the testator must have the capacity "to understand the extent of his property devised and the nature of the claims of others upon him." Redfield, in his work on Wills, (vol. 1, 4th ed. p. 124,) gives as the legal meaning of "sound mind and memory" the following: "The result of the best considered cases upon the subject seems to put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about." This doctrine has been quoted frequently by this court with approval, with the further statement that such doctrine so expressed was intelligible to the jury and embodied about the whole rule upon the subject so far as can be profitably given to a jury. (*Todd* v. *Todd,* 221 Ill. 410; *Yoe* v. *McCord,* 74 id. 33; *Campbell* v. *Campbell,* 130 id. 466; see, also, *McCoy* v. *Sheehy,* 252 id. 509.) We think the instructions in question came fairly within this rule.

The decree must be reversed and the cause remanded for such further proceedings as to law and justice may appertain.                          *Reversed and remanded.*