DIGGS v. STATE.

Opinion delivered December 18, 1916.

HOMICIDE—DEFENSE OF INSANITY—INSTRUCTIONS.—In a prosecution for homicide, the defendant interposed the plea of insanity, and was convicted of murder in the first degree. *Held*, the evidence was sufficient to support the verdict, and that the case was submitted to the jury upon proper instructions. (The case of *Bell* v. *State*, 120 Ark. 530, cited and approved.)

Appeal from Conway Circuit Court; *A. B. Priddy*, Judge; affirmed.

*W. P. Strait*, for appellant.

*Edw. Gordon*, of counsel.

1. There was strong testimony indicative of defendant's insanity; he labored under some hallucination of an impending or existing condition serious to himself and his safety. 12 Blandford on Insanity, 103; 1 Wharton & Stelle Med. Jur., § 390; Taylor's Med. Jur., p. 740, 784-5.

2. The court erred in refusing instruction No. 1, asked for defendant. Instruction No. 2 refused is a correct statement of the law. The question as to mental capacity to commit murder in the first degree has often been decided by this court. Insanity as an excuse for crime, or as a condition lowering the grade thereof, is in line with drunkenness or intoxication—mental incapacity. 97 Ark. 103; 76 *Id.* 286; 102 *Id.* 506; 40 *Id.* 511; 64 *Id.* 523; 120 *Id.* 530.

3. The presumption that when insanity is shown to exist at one time, it continues as a matter of law and exists at the time of the commission of the offense, unless the testimony shows a recovery. 76 Am. St. 85, note; 13 Abb. Pr. N. S. 207; 34 Oh. 372; 190 Pa. St. 138; 77 *Id.* 205.

*Wallace Davis*, Attorney General, and *Hamilton Moses*, Assistant, for appellee.

1. The instructions upon the question of insanity are correct. 26 Ark. 334; 40 *Id.* 511; 50 *Id.* 330; 54

*Id.* 588; 64 *Id.* 523; 98 *Id.* 132; 81 Ala. 577; 165 U. S. 373; 96 N. W. 417; 50 Atl. 1113; 52 *Id.* 434; 96 Am. St. 429; 107 Ky. 624; 12 Cyc. 169; 21 *Id.* 663.

2. It is no error for a trial judge to refuse a needless repetition of instructions. 52 Ark. 180; 58 *Id.* 472; 72 *Id.* 384; 74 *Id.* 33; 80 *Id.* 20.

3. The delusion was no excuse. 54 Ark. 601; 10 Cl. & F. 200.

HUMPHREYS, J. Appellant was indicted, tried and convicted of murder in the first degree in the Conway Circuit Court, on the 12th day of October, 1916. Sentence was imposed and the case is here on appeal.

Appellant's only defense was insanity. For a thorough understanding of the case, it will only be necessary to make the following resume of the facts. On June 29, 1916, about noon, appellant, a negro man, shot and instantly killed Mrs. Hoggard, a feeble white woman 78 years of age. This old lady was passing through appellant's horse lot when he fired the fatal shot. He forbade her coming in. She either did not hear him, or hearing, heeded not his command and he shot her down. Some five years before this time, he had bought a portion of the 40-acre tract of land upon which he lived at the time of the killing, from Mrs. Alice Rogers, a daughter of Mrs. Hoggard. In the contract, or deed for the sale of a portion of her land to appellant, Mrs. Rogers reserved the right for her mother to occupy the house in which she then lived on said tract, for her mother's lifetime. Differences grew up between Mrs. Hoggard and Tom Diggs, the appellant. Tom Diggs had tried to procure the arrest of Mrs. Hoggard for threatening to kill him. Mrs. Hoggard had prosecuted Tom Diggs for trespassing on her portion of the land. On this account, at one time he was put in jail but was afterward discharged. He had on various occasions, consulted officers and lawyers as to how he could get Mrs. Hoggard off the land. He had prevented her from getting water at his well.

F. H. Hammett was the first to arrive on the scene after the killing. Mr. Hammett had seen the negro lower the smoking gun from his shoulder and return to the house. Not knowing that the negro had killed Mrs. Hoggard, he went in to get a drink of water and first talked to the negro about working for him. He finally noticed that the negro had buck shot in a shell and asked him in a casual way "What in the devil are you shooting at this time of the day, there is nothing out there." The negro answered, "Well, I just shot a thief." The following conversation was had: "That so, Tom?" "I just shot a thief been bothering my chickens and eggs." "Have you killed that old spotted dog that has been bothering around?" "No, sir, wasn't a dog; it was down there by the corner of the barn." While drinking Hammett looked over in the lot and said, "Tom, what is that over there?" He said, "That is old lady Hoggard." "Negro, did you shoot her?" "Yes, sir." "You sure played hell now." "Well, I reckon maybe I did." "How bad is she shot?" "I don't know." "Do you know whether she is dead?" "No." "I am going to see." "All right, help yourself." "Tom, she is dead." "I don't know; I aimed to do it and did it."

Appellant then told Hammett that she had been disturbing him a great deal and trespassing on his premises; that he tried to get along with her and couldn't. Hammett then asked him to surrender, but he declined and in answer to Hammett's question as to whether he intended to fight it out, said he guessed that was what it amounted to. Through the advice of Hammett, he sent his children away from home so that they might not get killed in any subsequent encounter.

In a short time thereafter, Dr. J. B. Eddy, Sterling Garrett and F. H. Hammett went to the home of the negro and through a promise of protection until the officers came, persuaded the appellant to surrender to them. He told them that, "It seems that was the only way to get rid of it." He admitted the killing when he reached Blackville, the nearest town, and said that he did it "just to get rid of it."

Until two years before the killing, this negro had been a church member, a trustee therein, and superintendent of the Sunday school. At about that time he changed his whole attitude toward the church and claimed that churches and everybody connected with them were all wrong. He circumcised himself, claiming he did it under the direction of God. He asserted a belief in the doctrine of free love and attempted to form an association among his people of that kind. He became obstinate and declined to reason on questions with his friends, except in the way he thought. He would at times brood and spend much of his time reading. He was not as sociable with the community as before. His relatives testified that his uncle was supposed to have been insane and that their cousin Liddy on appellant's father's side was insane. Some of the lay witnesses, basing their opinion upon appellant's change of attitude toward the church, on moral questions and in temperament, expressed the opinion that he was insane at the time he did the killing. The only physician who testified in the case was Eddy, who had practiced in appellant's family and had known him and was familiar with his conduct. In his testimony he said: "I think that Tom Diggs was sane upon the issue involved in this killing. Under the circumstances surrounding this case, I think the defendant was sane in the matter." He said that he had heard that Diggs was off and watched him all the time he was in his custody to see if he could detect the least feature to lead him to believe that he was insane, but that "he was seemingly just as correct as he had ever seen him." Eddy said on cross-examination that, "Independent of any general knowledge of circumstances, and on a statement of facts as detailed in the evidence, I would think that a negro that would kill a white woman would be a fool and would be foolish to kill anybody unless they were more or less insane. Without any excuse a negro man who would take a gun and go kill an old white woman, that itself would be an act that ordinarily would indi-

cate a want of intelligence and realization of the consequences and effect of the act."

Appellant conducted his business in the usual way and made a living for himself and family.

The court gave 25 instructions defining murder, malice express and implied, the effect of the admission of the killing, the distinguishing essentials between murder in the first and second degree, the punishment for murder in the first and second degrees, defining manslaughter, the punishment for manslaughter, the manner of weighing evidence and the usual instructions on questions of reasonable doubt and presumption of innocence. On the questions of sanity or insanity, the court gave the following instructions:

"15½. Gentlemen of the Jury: Counsel for defendant interposes the defense of insanity, and this is a defense which the law recognizes. Where an accused is on trial for murder in the first degree and the State proves the killing under circumstances that would constitute murder in the first degree, if the homicide was committed by a sane person then if the killing is admitted and insanity is interposed as a defense, such defense cannot avail, unless it appears from a preponderance of the evidence, first, that at the time of the killing that the defendant was under such a defect of reason from disease of the mind as to not know the nature and quality of the act he was doing or, second, if he knew it that he did not know he was doing what was wrong; or third, if he knew the nature and quality of the act and knew it was wrong, that he was under such distress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease to resist the doing of the wrong act, which act was the result solely of his mental disease."

"16. You are instructed that one who in the possession of a sound mind commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone his reason, or for the time control his will, cannot be shielded from the consequence of his

act by the plea of insanity. That insanity will only excuse the commission of a criminal act when it is made to appear affirmatively, by evidence fairly preponderating, that the person committing the act was insane.

"17.   On the question of sanity or insanity of the defendant you will consider all the evidence offered in the case, the homicide itself, the manner in which it was committed, and the attending circumstances, the life, habits and conduct of the defendant, as well as his mental capacity or perverseness, if any, from his birth up to the present time, to determine whether or not the defendant was of sound or unsound mind at the time of the commission of the crime charged.

"20.   The court instructs you that before you can convict the defendant you must find from the testimony both as to the commission of the offense, and the condition of defendant's mind, beyond a reasonable doubt, that he is guilty of the charge upon which he is being tried; and, if upon a fair consideration of all the testimony, you entertain a reasonable doubt as to his guilt or innocence, then it would be your duty to give him the benefit of the doubt and acquit him.

"22.   The court further instructs you that in order to constitute a homicide, murder in the first degree, according to these instructions, the killing must have been wilful, deliberate, malicious and premeditated; and there must have been an intent in the mind of the defendant to take the life of the deceased at the time the act was committed, and this intent must have been formed after deliberation and premeditation, and premeditation as used in these instructions means thought of beforehand; deliberation means a weighing in the mind of the consequences of a course of conduct as distinguished from acting upon a sudden impulse without the exercise of the reasoning powers. It is immaterial how long the premeditation existed, so that it did exist and precede the homicide.

"23.   You are instructed that the opinions of both expert and non-expert witnesses as to the mental con-

dition of the defendant both before and since the killing of Mrs. R. L. Hoggard, has been put in evidence in this case and is proper and competent to be considered by you along with all the other evidence in the case in determining whether or not Tom Diggs at the time and in the killing of Mrs. R. L. Hoggard was sane or insane as described and within the meaning of the instructions given you by the court. These opinions do not, as a matter of law, supplant your duty and province of determining this question, but is to be considered by you and weighed by the same rules applicable to any other testimony; and, like all other testimony, given just such weight, as you gentlemen, seeking to find and disclose the truth, may think it justly deserves."

The defendant asked 13 instructions, most of them touching upon the question of insanity. They range from mere delusions to total incapacity.

The testimony is so meager and general on the question of insanity that it is rather hard to frame specific instructions on that question

This court said in the case of *Bell* v. *State,* 120 Ark. 530, "that when the killing was admitted, the defense of insanity cannot avail unless it appears from a preponderance of the evidence, *first* that at the time of the killing that the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, *second,* if he did know it, he did not know that he was doing what was wrong; or, *third,* if he knew the nature and quality of the act, and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done, and unable, because of the disease, to resist the doing of the wrong act, which act was the result of his mental disease." This court further said in that opinion on page 556, in substance, that after the court had declared the above tests and announced the burden of proof, it would be better for him simply to instruct the jury that if they believed from the preponderance of the evidence that the appellant was insane, they

should acquit him, otherwise they should convict him of the crime charged.

We think instruction number 15½ given by the court, covers each of the tests of insanity laid down by the court in the case of *Bell* v. *State*. That instruction, together with other instructions given by the court on the question of insanity, certainly covered every test of insanity under the evidence in this case necessary to give an impartial trial to the appellant, such as is guaranteed to him by the constitution and laws of our State. It seems to us that the rule laid down in the Bell case, *supra*, was strictly adhered to in the trial of this cause. Instructions ought to be responsive to the evidence. As far as we are able to observe, the instructions given in this case are peculiarly applicable and responsive.

There being no error in the instructions submitting the question of insanity to the jury, and ample evidence of a substantial nature to support the verdict of the jury, the judgment is in all things affirmed.