## STATE v. GREEN.

No. 5073. Decided August 27, 1931. (6 P. [2d] 177.)

582

*Woolley & Holther,* of Ogden, for appellant.

*Geo. P. Parker,* Atty. Gen., and *Byron D. Anderson,* Deputy Atty. Gen., for the State.

ELIAS HANSEN, J.

The defendant was found guilty of murder in the first degree without recommendation and sentenced to be executed. He was charged with and convicted of the murder of his uncle James Green. He appeals and seeks a reversal of the judgment because of some of the instructions which were given to the jury, because some of his requested instructions to the jury were refused, and because the trial court refused to admit evidence offered by him to show that a cousin of his father and a cousin of his grandmother were insane. The chief ground relied upon by defendant in support of his plea of not guilty was that he was insane at the time of the alleged homicide. In order that the questions of law presented for determination on this appeal may be more readily discussed and understood, we deem it advisable to summarize what the evidence tends to establish as the facts in this case.

The defendant is about 22 years of age. At the time of the homicide he had a wife and young baby. He and his family resided at Ogden, Utah, where he was employed at a junk house. A Mr. Thompson resided with the defendant

and his family. While the defendant was at home for his noonday meal on January 4, 1930, he and his wife had some slight disagreement. After the defendant returned to work his wife wrote a note stating that she was going to the home of her mother. During the afternoon defendant's wife went to her mother's home which is located to the east of and near Layton, Davis county, Utah. When the defendant returned from work, he found the note which his wife had written. When Mr. Thompson returned from work he and the defendant went to a restaurant in Ogden for their evening meal. While they were down town, the defendant purchased a pocketknife which had an unusually long blade. Shortly after 9 o'clock the defendant and Mr. Thompson went to bed. They both occupied one bed, which was in one of the rooms of defendant's home. After they had been in bed a few minutes, the defendant got up again and dressed. He informed Mr. Thompson that he was going down town and that he would be back in a few minutes. He drove away in his automobile. He went to a secondhand store in Ogden, where he purchased a revolver and some cartridges. He then drove out to the home where his mother-in-law resided. He arrived there at about 11 o'clock p. m. When he arrived at the home of his mother-in-law, all of the occupants had retired for the night. The house consisted of three rooms. Gladys Green, the wife of the defendant, Lola Green, the mother-in-law of the defendant, and the baby, the issue of the marriage of the defendant and Gladys Green, occupied a bed in one of the rooms. Hannah Green, the grandmother of the defendant, and Lois Gree, a cousin of the defendant, occupied a bed in another room, and James Green, an uncle of the defendant, occupied a cot in the other room, which was the kitchen. Lois Green is the daughter of James Green and Lola Green. Defendant's wife was not the daughter of James Green but was the daughter of Lola Green by a former marriage. When defendant arrived at the Green home, he knocked on the door which led to the room occupied by James Green. Upon hearing the knock, James Green arose and opened the door.

James Green then lighted a kerosene lamp and built a fire in the kitchen stove with corncobs. Hannah Green heard the defendant's knock and later heard him and James Green engaged in a conversation in the kitchen. She got out of bed and went around the house into the kitchen. After she had been in the kitchen a short time, "defendant asked Jim 'what they must do with the things' and Jim said 'go in the other room and talk to the women.'" Hannah Green asked the defendant to call in and see her before he left. When Delbert Green and James Green went into the room occupied by Gladys and Lola, Hannah returned to her room and went back to bed. After Mrs. Hannah Green had been in bed about fifteen minutes, she heard a shot, and immediately jumped out of bed and ran around the house to the kitchen door. There she saw her son James running out through the gate with his hand to his side. He said, "Ma, I am shot." Mrs. Hannah Green then heard some more shots and went back to the door which led into the room occupied by Gladys, Lola, and the baby. She did not see the defendant any more that night because it was dark and she could not see. In the meantime Lois heard some shots and ran around the house into the kitchen. She saw the defendant re-enter the house. He had a flashlight in one hand and a revolver in the other. Lois took hold of defendant's coat tail and asked him to quit. He went into the room where Gladys, Lola, and the baby were in bed and fired one shot at Gladys. He then went out of the house. Lois then went to the bed where her mother was groaning and asked her if she was hurt, to which she replied that she was. Hannah Green returned to the house and told Lois to run for David Green, who was a relative of the Green family. Hannah Green, after taking the baby and placing it on the cot which had theretofore been occupied by James Green, followed Lois to the home of David Green. As soon as Lois Green informed David Green of what had occurred, he notified Horace Van Fleet, deputy sheriff of Davis county. Mr. Van Fleet, accompanied by Robert T. Harris, the marshal of Layton, Will Adams, and D. Tracy

proceeded to the home of James Green. Before they arrived there, they met David Green. A short distance from the Green home they found the dead body of James Green. It was lying on the side of the road with a gunshot wound in the right breast. At the Green home they found the dead bodies of Lola Green and Gladys Green. Both of the bodies were lying on the bed where they had been sleeping. The body of Lola Green had two gunshot wounds in it, one near the center and at the top of the breastbone and one just below the right ear. The body of Gladys Green had two bullet wounds in the right side of the breast. The baby was lying on the cot where it was placed by Hannah Green. The pocketknife which the defendant purchased at the second-hand store in Ogden, the flashlight, and an unloaded shotgun were found on the kitchen table.

The defendant was arrested between 3 o'clock and 4 o'clock on the morning of January 5, 1930. When apprehended, he was at his home in bed with Mr. Thompson. The revolver which he bought the night before and several cartridges were in the pockets of his overcoat. The revolver had three cartridges under the ejector so that the cylinder would not close. The defendant's automobile was parked in an alley near his home. Soon after the defendant was placed under arrest, he was taken to the police station of Ogden City, Utah. He was asked if he desired to make any statement, and was informed that any statement that he might make would be used for or against him. He said that he was willing to make a statement. He was then interrogated by a number of police officers. In answer to interrogatories, he gave this version of what had occurred on the night before: That he purchased the pocketknife, the revolver, and the cartridges at a secondhand store in Ogden; that he had been having some family troubles; that every time his mother-in-law and his uncle James came to see him he would have a lot of trouble after they left; that when he left Ogden he made up his mind "to either have peace or make peace when he got down there and that is what happened"; that after he went into the Green house he

talked with his uncle, and then he and his uncle went into the bedroom where his wife and mother-in-law were in bed; that his uncle sat down on a chair and the defendant was standing; that when James Green arose from his chair he thought he heard something rattle or snap in his pocket and that James Green had a gun in his pocket; that James ran out after he was shot; that he then shot his wife and mother-in-law; that he then went out where he saw James Green, who said, "For God's sake don't shoot me again"; that he again went into the house and shot one of the women; that he did not know why he went back into the house unless it was "to make a good job of it"; that he did not know why he shot James Green; that he and James Green were friendly; that he intended to kill himself with the revolver but it jammed so that he could not use it; that he tried to find some shells for the shotgun which belonged to James Green but he could not find any; that he was afraid that the pocketknife was not sharp enough to kill himself with; that he did not intend to kill Hannah Green, Lois Green, or the baby; that when he returned to Ogden from the Green home he avoided traveling on the state highway.

The evidence further shows that the father of the defendant became insane and was committed to the state mental hospital at Provo, Utah, when he was 24 years of age. He did not recover his sanity, but died at the hospital a few years after his commitment. At the time defendant's father was committed to the state mental hospital, he had a dislike for his wife and his mother. A full sister of defendant's father became insane when she was about 40 years of age. She was violent towards her mother and husband and frequently tried to injure them. She was committed to the state mental hospital, but was later restored to her sanity and released. The grandfather of the defendant committed suicide, but, except for the fact that he committed suicide, there was no evidence that he was insane. At the time of the trial the defendant was afflicted with toxic goiter, which was of some years' standing. The defendant completed the

seventh grade at school. He had served a short term in the penitentiary for shooting at and wounding a young man who had been out riding in an automobile with his wife, and who, when shot, was found by the defendant in company with his wife at about midnight. Hannah Green, defendant's grandmother, testified that when she went in the kitchen of the Green home where the defendant and James were talking the defendant was white, his eyes were wild, he was nervous and trembling. She gave it as her opinion that the defendant was insane at that time. Two psychiatrists were called and testified in behalf of the defendant as to his mental condition. Dr. Alfred A. Robinson, one of the psychiatrists, testified that he made a physical and mental examination of the defendant in February, 1930; that the defendant was, and for some time had been, afflicted with toxic goiter; that his hands have a tremor and his pulse was between 104 and 108; that his blood pressure was 150/80, all of which are characteristic of goiter; that toxic goiter causes those afflicted therewith to become very nervous and irritable and at times causes certain types of insanity known as toxic thyroid insanity; that the defendant has the mentality of a person between 9 and 10 years of age. Dr. Robinson, in answer to a hypothetical question, expressed it as his opinion that the defendant was insane and did not know right from wrong at the time he shot James Green, but that he was not insane for any considerable time before or after the homicide; that in his opinion the defendant was not insane in February when he examined him. In answer to a hypothetical question asked the other psychiatrist, Dr. Foster J. Curtis, he expressed it as his opinion that the defendant was sane in the sense that he knew right from wrong at the time he shot James Green, but that at that time the defendant was unable to control his actions. On cross-examination, Dr. Curtis testified that in his opinion defendant was able to control his action until about the time that he fired the fatal shot. No expert or other testimony was offered by the state as to the mental condition of the defendant.

The instructions given by the trial court to the jury to which counsel for defendant objected and excepted and here assigns as error, read as follows:

"No. 3. It is not controverted in this case that the defendant, Delbert Green, on the 4th day of January, 1930, in the County of Davis, State of Utah, shot the deceased James Green with a pistol, inflicting upon said James Green mortal wounds from which wounds, said James Green died on said 4th day of January, 1930.

"No. 4. It is the State's claim in this case that the shooting was done maliciously with premeditation and deliberation and was murder in the first degree. The defendant on the other hand denies that the shooting was done maliciously with premeditation or with deliberation; denies that it was any crime at all; and claims that at the time he did the shooting he was affected with insanity. * * *

"No. 13. The burden of proving the defendant guilty of the charge by evidence that convinces your minds beyond all reasonable doubt rests upon the State of Utah, and this burden never shifts. This does not mean, however, that at the outset of the case the State must in addition to the elements of the crime hereinafter set out prove the sanity of the defendant. The State of Utah may rely upon the presumption that the defendant is sane until such time as the defendant comes forward with evidence which is more convincing than that presumption that he was insane.

"No. 14. If the defendant comes forward with evidence which is more convincing than that presumption of sanity, then the burden shifts to the State of Utah to prove to you beyond all reasonable doubt not only each of the elements of the crime hereinafter set out, but to prove to you beyond all reasonable doubt that the defendant at said time was sane. If the State of Utah fails in upholding this burden, or if there is a reasonable doubt in your mind from the evidence introduced as to whether or not the defendant was sane, it is your duty to acquit him and render a verdict of 'Not Guilty by reason of Insanity.' "

There can be no serious doubt but that it was error to give instruction No. 3 and that part of instruction No. 4 which we have quoted. In this jurisdiction the trial judge is not permitted to comment on the evidence, much less may he indicate to the jury that some material facts, not admitted at the trial, are established beyond controversy. It is the sole and exclusive province of the jury to determine the facts in all criminal cases, whether

the evidence offered by the state is weak or strong, is in conflict or is not controverted. Evidence may be ever so convincing that an accused is guilty of the crime charged, yet, it is for the jury and not for the trial judge to render the verdict. If the trial judge may not find a verdict of guilty, so, likewise he may not find any of the facts which are necessary elements of the crime for which the accused is being tried. The defendant in this case entered a plea of not guilty, and such plea put in issue all of the material allegations of the information and cast upon the state the burden of proving beyond a reasonable doubt each and all of such material allegations before the defendant may be found guilty of the crime charged. Obviously the allegation that the defendant shot James Green with a pistol, that James Green died as a result of wounds inflicted by the defendant, and that the wounds were inflicted in Davis county, Utah, are material and necessary elements in the crime of murder in the first degree as well as the included crimes of murder in the second degree and voluntary manslaughter. In this connection it may be well to note that the defendant did not testify at the trial, and, so far as appears, his counsel did not admit that their client killed James Green. The fact that the defendant may have confessed that he shot James Green may be and upon the record in the instant case was properly received for the jury to consider in determining his guilt or innocence, but such evidence is not as a matter of law binding upon the defendant. The provision of our State Constitution which grants accused persons the right to a trial by jury extends to each and all of the facts which must be found to be present to constitute the crime charged, and such right may not be invaded by the presiding judge indicating to the jury that any of such facts are established by the evidence. The constitutional provision may not be disregarded under the pretext that there is no conflict in the evidence or that the evidence will permit of but one finding. When an accused enters a plea of not guilty, he has a right to have his entire case submitted to the jury unless he waives such right by expressly admitting at the

trial the existence of some fact or facts which is or are put in issue by the plea of not guilty. These principles of law are so fundamental in our system of criminal procedure that we deem it unnecessary to cite cases and authorities in support thereof.

Counsel for defendant earnestly urge that the court below was in error in giving instructions Nos. 13 and 14. It will be observed that in instruction No. 13 the jury was informed that the burden of proving the defendant guilty beyond a reasonable doubt rests upon the state and this ▉▉▉ burden never shifts. In instruction No. 14 the jury was informed that, "if the defendant comes forward with evidence which is more convincing than the presumption of sanity then the burden shifts to the State of Utah to prove to you beyond all reasonable doubt * * * that defendant at said time was sane." It is difficult, if not impossible, to reconcile these two statements, and they may well have confused the jury. Instructions No. 13 and 14 are objectionable, not only because they contain conflicting statements of law, but because they are founded upon a wrong conception of the law as applied to the defense of insanity. The presumption that one accused of crime was sane at the time the alleged crime was committed serves the function of casting upon the defendant the necessity of going forward with evidence tending to show that he was insane at the time the alleged crime was committed unless the state has offered evidence which tends to show that the defendant was insane at the time. Until evidence is offered and received at the trial which tends to show that the defendant was insane at the time of the alleged crime, the state may rely upon the presumption of sanity and need not offer evidence to establish that fact. In the absence of evidence, sanity is assumed to exist without evidence of its existence. When, however, evidence is received which tends to show that the accused was insane at the time of the alleged offense, then, and in such case, an issue is raised as to the mental condition of the accused, and it becomes the duty of the jury to determine such issue from the evidence indepen-

dent of and uninfluenced by the presumption of sanity. When evidence tending to show that the accused was insane enters into the case, the presumption of sanity disappears from the case, and the jury is no longer concerned with the presumption of sanity, but must determine the fact of sanity or insanity solely from the evidence. The presumption of sanity is not evidence of sanity, and may not be so considered by the jury where there is evidence before the jury tending to show that the accused was insane at the time charged. While there is considerable confusion and some conflict in the adjudicated cases as to the function which a presumption, such as that of sanity serves in a trial of an issue of fact, we are of the opinion that the great weight of authority as well as the better reasoning support the views just stated. A few quotations from recognized authorities may further illustrate our views.

"The better reasoned authorities hold that a presumption is not evidence of a fact, but purely a conclusion, having no probative force, and designed only to sustain the burden of proof until evidence is introduced tending to overcome it." Jones, Comm. on Evidence (2d Ed.) § 30, p. 59.

"While it is obvious, then, that a presumption, i. e., the assumption, intendment, taking-for-granted, which we call by that name, accomplishes, for the moment at any rate, the work of reasoning and evidence, it should be remarked, as I have said before, that neither this result, nor the rule which requires it, constitutes, in itself, either evidence or reasoning. This might seem too plain to require mention if it were not for the loose phraseology in which courts sometimes charge the jury, leaving to it in a lump 'all the evidence and the presumptions,' as if they were capable of being weighed together as one mass of probative matter. The error is not limited to trial courts. Such a remark might pass as merely a loose and inaccurate way of saying that it accomplishes the result of evidence or reasoning, if it were not that sometimes judges go on to declare that the presumption is in itself so much probative matter, to be weighed as against other probative matter, i. e., evidence in the proper sense of the word, and make this notion the basis of a decision. Such an error is quite too grave and harmful to be overlooked." Law of Evidence, Thayer, pp. 337-339.

"Nevertheless, it must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to

invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule." Wigmore on Evidence (2d Ed.) vol. 5, § 2491, pp. 451, 452.

Cases are collected in footnotes to the above quotations which support the texts.

The function served by a presumption has been considered by this court in a number of cases. In the case of *State* v. *Brown*, 36 Utah 46, 102 P. 641, 24 L. R. A. (N. S.) 545, it was held that the evidence tending to establish the insanity of the defendant was such that the presumption of sanity was completely overthrown and that the defendant in that case, as a matter of law, was entitled to an acquittal. Some language is used in that case which would seem to indicate that the presumption of sanity is in the nature of evidence of sanity. If the presumption of sanity were regarded as evidence of sanity at the time the Brown Case was decided, such view has been disapproved by subsequent decisions of this court. In the case of *Ryan* v. *Union P. R. Co.*, 46 Utah 530, 151 P. 71, 74, this court said:

"Whenever the facts or circumstances are shown concerning which the presumption is indulged, the presumption ceases, and the controversy is to be decided by the weight of the evidence adduced. That is not what the court charged. As charged, the jury were permitted to cast the presumption on the scales and to consider and weigh it with the proven facts and circumstances. There is a presumption of sanity, but when evidence respecting the sanity or insanity of the person whose mental condition is the subject of inquiry is adduced, the presumption, except as it bears on burden of proof, is spent and the controversy is to be decided on the weight of the evidence adduced."

In the case of *State* v. *Mewhinney*, 43 Utah 135, 134 P. 632, L. R. A. 1916D, 590, Ann. Cas. 1916C, 537, it was held that there was not sufficient evidence to entitle the defendant to go to the jury on the question of insanity. In the case of *State* v. *Vacos*, 40 Utah 169, 120 P. 497, 502, it is said that

"We are clearly of the opinion, therefore, that in any case coming within the purview of section 4856 the duty or burden is cast upon the defendant to produce or bring forward the evidence in support of justification or excuse, but he is not required to establish the justification or excuse by a preponderance of the evidence before he is entitled to avail himself of that defense. All that he is required to do is to produce sufficient evidence of justification or excuse which, when considered with all the other evidence in the case, will create a reasonable doubt in the minds of the jurors whether the homicide in question was justified or excusable or not."

The rule thus announced in the Vacos Case was quoted and followed in the case of State v. Dewey, 41 Utah 538, 127 P. 275, and in State v. Harris, 58 Utah 331, 199 P. 145. In State v. Steadman, 70 Utah 224, 259 P. 326, it was held that the presumption of innocence is not evidence, and that the defendant in a bastardy proceeding is not entitled to have a jury so instructed.

Counsel for the state do not contend that the presumption of sanity should be considered by the jury as evidence of sanity. The position taken by the state is that the instructions complained of, when considered in connection with other instructions given to the jury, do not warrant the claim made by counsel for the defendant, namely, that instructions Nos. 13 and 14 inform the jury that the presumption of sanity is evidence of sanity. It will be observed that instruction No. 13 informed the jury that "The State of Utah may rely upon the presumption that the defendant is sane until such time as the defendant comes forward with evidence which is more convincing than that presumption that he was insane." In instruction No. 14 the jury was informed that "If the defendant comes forward with evidence which is more convincing than the presumption of sanity, then the burden shifts to the State of Utah to prove to you beyond a reasonable doubt," etc.

The clear meaning of the language just quoted is that it became the duty of the jury at the outset to place the presumption of sanity on one side of the scale and the evidence

tending to show insanity on the other side of the scale and thus determine the relative weight of the presumption of sanity as compared with the evidence of insanity. If by this process of comparison the jury should determine that the presumption of sanity was equal to or outweighed the evidence of insanity, then they must find the defendant sane. If, however, the evidence tending to show that the defendant was insane at the time of the alleged crime outweighed the presumption of sanity, then, and not until then, was the jury at liberty to weigh the evidence bearing upon the question of sanity and insanity. While the court did not expressly inform the jury, in the instructions now under review that the presumption of sanity is evidence, what was said clearly conveys the idea that the presumption of sanity has evidentiary value. The jury was informed that the presumption of sanity continues until overthrown by evidence "which is more convincing than the presumption." Such a statement of the law is almost certain to lead to uncertainty and confusion. It requires the jury to compare and determine the relative weight of evidence on the one hand with the presumption on the other. Such a task is fraught with so many difficulties as to render it well nigh impossible of intelligent solution, and is calculated to mislead and confuse the jury, especially in the absence of some rule of law whereby the weight of the presumption may be determined. Some courts classify presumption into two classes, disputable and conclusive. 1 Jones, Comm. on Evidence, § 42, p. 79. Various degrees of proof are required to overthrow the various so-called disputable presumptions. Under the instruction complained of, each juror was at liberty to give as great or small a weight to the presumption of sanity as he might see fit. Thus the determination of an issue raised by a presumption of sanity on the one side and evidence of insanity on the other must be a mere guess. Whatever weight the jury might have given to the presumption of sanity would be against the interest of the accused, and may well have influenced the verdict of the jury. Nor can it be said that the other in-

structions given to the jury cured the error complained of. As was said by this court in the case of *Jensen* v. *Utah Ry. Co.*, 72 Utah 366, 270 P. 349, 355, "where instructions are in irreconcilable conflict, or so conflicting as to confuse or mislead the jury, the rule requiring instructions to be read together has no application," and "that the giving of inconsistent instructions is error and sufficient ground for a · reversal of the judgment, because, after verdict, it cannot be told which instruction was followed by the jury, or what influence the erroneous instruction had on their deliberations. * * * " The correct rule is that the presumption of sanity prevails only until such time as evidence is received at the trial which tends to show insanity, and that it is the duty of the trial judge and not of the jury to determine when there is sufficient evidence to raise an issue as to the sanity or insanity of the accused. When the trial judge shall have determined that there is some evidence which tends to show that the accused was insane at the time of the alleged offense, then it becomes his duty to submit such question to the jury. When the issue is thus raised by the evidence, the jury should be instructed to determine such issue of sanity or insanity solely upon the evidence, · and, if they entertain a reasonable doubt upon that issue, defendant is entitled to an acquittal. In this case the evidence tending to show that the accused was insane at the time of the alleged offense was sufficient to entitle him to have that issue determined by the jury under proper instructions by the court. Counsel for the state do not seriously contend to the contrary. The learned trial judge evidently regarded the evidence sufficient to raise that issue; otherwise he would not have submitted it to the jury. The defendant requested the court to instruct the jury to bring in a verdict of not guilty, apparently upon the theory that the evidence established the insanity of the defendant as a matter of law. No such contention, however, is made here, and, if it were, it could not be successfully maintained.

Counsel for the defendant made a number of requests whereby he sought to have the trial court define insanity.

None of these requested instructions were given in the form requested, and such refusal is assigned as error. In the interest of brevity and clarity, we shall discuss generally the nature of the instructions which the defendant was entitled to have given to the jury on the question of insanity rather than to point out in detail wherein the various requested instructions correctly state the law and wherein they fail to state the law. Not all persons who are afflicted with insanity, lunacy, idiocy, or other unsoundness of mind are to be exonerated from punishment for their criminal acts merely because of such affliction. Insanity may be a complete defense to a criminal act, it may reduce the degree of the offense where the crime is divided into degrees and where a particular intent is a necessary element of the greater degree, and it may neither excuse nor mitigate the offense. Insanity is effective in warding off or reducing punishment for crime only when it renders the person so afflicted irresponsible or partly irresponsible. Assuming that the jury in this case found from the evidence beyond a reasonable doubt that the defendant shot and killed James Green as charged in the information, he would be entitled to an acquittal if at that time he was, as a matter of fact, insane to such an extent that he either (1) did not know the nature of his act, that is, did not know that he had a revolver, that it may be loaded, and that, if discharged at or towards James Green, it would probably injure or kill him; or (2) that when he fired the shot he did not know it was wrong in the sense that such act was condemned by morals or law; or (3) that he was unable by reason of his mental disease to control his actions or impulses to injure or kill James Green. If the defendant was afflicted with a disease of the mind at the time of the alleged offense in any one or more of the three manners and to the extent indicated, then and in such case he was not legally responsible. In some jurisdictions a plea of insanity, to be available, must be established by a preponderance of the evidence, but such is not the law in this state. In this jurisdiction evidence which raises a

reasonable doubt in the minds of the jury as to the sanity of the accused at the time of the alleged offense entitles him to an acquittal. There is a direct conflict in the authorities as to whether or not one who knows the nature and quality of his-act and also knows the act is wrong, but is unable to control his conduct, can be said to be legally irresponsible. One line of authorities hold that one, who because of mental disease has an irresistible impulse to commit a criminal act is not legally responsible even though such person may know the nature and quality of his act, and also know that the act is wrong. The following cases are among those that support such view: *Davis* v. *U. S.,* 165 U. S. 373, 17 S. Ct. 360, 41 L. Ed. 750; *Parsons* v. *State,* 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193; *Diggs* v. *State,* 126 Ark. 455, 190 S. W. 448; *Ryan* v. *People,* 60 Colo. 425, 153 P. 756, L. R. A. 1917F 646, Ann. Cas. 1917C, 605; *State* v. *Saxon,* 87 Conn. 5, 86 A. 590; *State* v. *Jack,* 4 Pennewill (Del.) 470, 58 A. 833; *Plake* v. *State,* 121 Ind. 433, 23 N. E. 273, 16 Am. St. Rep. 408; *State* v. *McGruder,* 125 Iowa, 741, 101 N. W. 646; *Hall* v. *Com.,* 155 Ky. 541, 159 S. W. 1155; *People* v. *Durfee,* 62 Mich. 487, 29 N. W. 109; *State* v. *Jones,* 50 N. H. 369, 9 Am. Rep. 242; *Blackburn* v. *State,* 23 Ohio St. 146; *Commonwealth* v. *De Marzo,* 223 Pa. 573, 72 A. 893; *State* v. *Kelley,* 74 Vt. 278, 52 A. 434; *Thurman* v. *Com.,* 107 Va. 912, 60 S. E. 99; *Flanders* v. *State,* 24 Wyo. 82, 156 P. 39, 1121.

The following cases are among those that hold an irresistible impulse to commit a criminal act is not alone sufficient to excuse a criminal act: *People* v. *Harris,* 169 Cal. 53, 145 P. 520; *Hall* v. *State,* 78 Fla. 420, 83 So. 513, 8 A. L. R. 1234; *State* v. *O'Neil,* 51 Kan. 651, 33 P. 287, 24 L. R. A. 555; *State* v. *Knight,* 95 Me. 467, 50 A. 276, 55 L. R. A. 373; *Smith* v. *State,* 95 Miss. 786, 49 So. 945, 27 L. R. A. (N. S.) 461, Ann. Cas. 1912A, 23; *State* v. *Weagley,* 286 Mo. 677, 228 S. W. 817; *Flanagan* v. *People,* 52 N. Y. 467, 11 Am. Rep. 731; *State* v. *Hassing,* 60 Or. 81, 118 P. 195; *Turner* v. *Territory of Okl.,* 15 Okl. 557, 82 P. 650; *State* v. *Alexander,* 30 S. C. 74, 8 S. E. 440, 14 Am. St. Rep. 879; *Thomas* v. *State,* 55 Tex. Cr. R. 293, 116 S. W. 600; *State*

v. *Craig,* 52 Wash. 66, 100 P. 167; *State* v. *Harrison,* 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224; *Oborn* v. *State,* 143 Wis. 249, 126 N. W. 737, 31 L. R. A. (N. S.) 966. Other cases dealing with the question of irresistible impulse as a ground of defense in criminal cases will be found collected in 16 C. J. 102. The question is fully discussed from a medical and criminal viewpoint in a comparatively recent work by S. Sheldon Glueck entitled Mental Disorders and the Criminal Law.

In this state it has been held that one who does not know the nature and quality of his act or does not know that the act is wrong is legally insane. *State* v. *Brown,* supra. This court has not directly passed on the question as to whether or not a person is legally responsible where he knows the nature and quality of his act and also knows that the act complained of is wrong, but because of a diseased mind is unable to control his conduct. That question was apparently not presented, or, if presented, was not discussed, in the case of *State* v. *Brown,* supra, and moreover Brown was found, as a matter of law, to be insane. The doctrine of irresistible impulse was referred to in the case of *State* v. *Mewhinney,* supra, but was not determined. In that case it was held the evidence was insufficient to raise the question of insanity. It is the general, if not the uniform, opinion of those who have made a careful and scientific study of mental diseases, that some forms of insanity are characterized by inability of the person afflicted to choose the right and avoid doing the wrong. In the light of such generally accepted views coming from those who are best qualified to speak on the subject, we are of the opinion that courts are not justified in holding that, as a matter of law, no such form of insanity exists, or that such insanity does not render the person so afflicted legally irresponsible. One who knows the right but because of mental disease his will is so deranged or disordered that it fails to function and cannot direct or control the acts of the person so afflicted is and should be recognized as being legally insane. Volitional ability to choose the right and avoid the

wrong is as fundamental in the required guilty intent of one accused of crime as is the intellectual power to discern right from wrong and understand the nature and quality of his acts. In reaching this conclusion, we are not unmindful that many courts have reached a different conclusion. The principal objections urged against recognition of such a form of insanity are that such insanity is difficult to prove or disapprove, and that, if such a form of insanity is recognized, it may be resorted to as a defense in cases where it has no proper application. Insanity, in all its forms, is frequently difficult to determine with certainty, and yet courts all recognize that, if an accused does not know right from wrong and does not know the nature and quality of the act charged, he should not be punished. Insanity, in its various forms, may, and in many instances doubtless has been, resorted to as a defense in cases where it has no proper application; yet such facts do not justify courts in closing the door to the defense of insanity. The learned trial judge before whom this case was tried took such view and in effect so instructed the jury. The instruction given is a correct statement of the general law where insanity is interposed as a defense, but such instruction would have been more satisfactory if it had been specifically applied to the evidence in this case as we have heretofore indicated. No objection, however, is urged to the instruction given on that ground. The contention is made on behalf of the defendant that the instruction given on the question of insanity does not go far enough, in that, if the defendant was not of sound mind at the time of the alleged crime, he is not amenable to the law, and that, if the defendant's mind was impaired and unsound so that for the time being it overruled his reason or judgment or conscience, he should be acquitted. A person is not entitled to an acquittal for the commission of a crime merely because he has an unsound mind; neither is he entitled to an acquittal merely because his reason or judgment or conscience may be overruled at the time the crime was committed. To entitle one to an acquittal for the commission of a crime on the ground of insanity, it is not

sufficient that the mind be merely unsound or affected with insanity, but it must be of the nature and extent heretofore stated. Nor is a person who has merely lost his judgment or conscience to be exonerated from punishment for a crime. While on irresistible impulse caused by a mental disease is recognized as a defense, a mere "temporary frenzy or passion arising from excitement or anger,. * * * even though the frenzy or passion may be ungovernable and may produce the crime, * * * does not exempt one from responsibility, where he is otherwise sane. * * * " 16 C. J. 104, § 78. The text just quoted is supported by numerous cases cited in the footnote. The only irresistible impulse recognized as a complete defense to a crime is one arising solely from a mental disease.

One of defendant's requested instructions seems to proceed upon the theory that the appellant was acting under an insane delusion or hallucination at the time of the alleged homicide. The law seems to be well settled that one is not responsible for a criminal act while acting "under an insane delusion or hallucination, although he is rational on other subjects, * * * where the fact or state of facts existing in his imagination would, if actually existing, justify or excuse the act." 16 C. J. 101, § 76. So far as appears from the evidence in this case, the appellant was not subject to delusions or hallucinations at the time of the alleged crime. The only suggestion that his mind was so affected is his statement to the peace officers that when James Green arose from his chair he thought he heard something rattle or snap and he thought James Green had a gun in his pocket. Obviously, that statement is not evidence that the appellant's mind was affected with delusions or hallucinations. What the defendant thought may or may not be true, and, even if it were true, the defendant did not claim in his statement to peace officers, so far as appears, that he believed James Green was about to injure him. Upon this record the defendant was not entitled to have the jury instructed on the law as applied to delusions or hallucinations.

While an accused is not entirely relieved from responsibility for the commission of a crime on account of insanity unless the insanity be of such a nature and ■■■■ degree that he did not know the nature or quality of his acts, or that he did not know the act was wrong, or that his mind was so impaired by disease that he was unable to control his act, nevertheless a mental disease falling short of any of these effects may, where a particular intent is a necessary element of a higher degree of a crime, have the effect of reducing the degree of such crime. If the appellant was so afflicted with insanity that he was "mentally incapable of deliberating or premeditating, and to entertain malice aforethought, and to form a specific intent to take the life of the deceased, in such event the jury should not find him guilty of murder in the first degree." The language just quoted is the law announced by this court in the case of *State* v. *Anselmo*, 46 Utah 137, 148 P. 1071. While the defense urged in the Anselmo Case was intoxication, the law there announced is equally applicable where, as here, the defense of insanity is made an issue. The trial court in this case, in effect so instructed the jury, and no complaint was made by the appellant because of such instruction. The appellant does, however, complain because the trial court refused to instruct the jury on the law of voluntary manslaughter. When insanity is made an issue in a case of homicide, such insanity may have the effect of reducing the homicide to voluntary manslaughter. In this case there is evidence which tends to show that a short time before the alleged crime was committed the defendant was very nervous, that he was trembling, his face was white, and "his eyes were wild."

Voluntary manslaughter is the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. Comp. Laws of Utah 1917, § 8027.

If appellant killed the deceased in the heat of passion and without malice, he may be guilty of voluntary manslaughter, provided, of course, that he was legally responsible. While the record before us fails to show facts that would be likely

to cause a normal mind to be wrought up to a heat of passion, yet, there is some evidence in the record that the mind of defendant was so wrought up, and such evidence, together with the evidence tending to show that the defendant was insane, was sufficient to entitle the defendant to have the jury instructed as to the law of voluntary manslaughter and have that question submitted to the jury.

The defendant offered evidence to show that a cousin of his grandmother was insane and was committed to the state mental hospital at Provo, Utah, and that a cousin of his father was insane and committed to the state mental hospital at Provo, Utah. The court refused to admit such evidence, and such ruling is assigned as error.

The state contends that insanity of collateral blood relatives of the defendant was properly excluded, and in support of such contention the following authorities are cited: *State* v. *Warren*, 317 Mo. 843, 297 S. W. 397, and *Commonwealth* v. *Brubaker*, 32 Pa. Co. Ct. R. 344; Underhill on Evidence (2d Ed.), § 160, p. 308. The rule contended for by the state seems to be the established law in Missouri, but the great weight of authority, as well as the better-reasoned cases, are against such rule. 1 Wharton and Stille's on Medical Jurisprudence (5th Ed.), § 580, p. 587, has the following to say upon that question:

"But heredity does not act with mathematical precision. Given an insane parent, it does not follow that all the children will inevitably be insane. Neither does it follow that the heredity is necessarily shown from parent to child through a number of generations. It is comparatively rare, even in cases in which there is a well-marked family history of insanity, to observe that the transmission follows unerringly the line of lineal descent. The collateral branches must always be searched to make the investigation complete. This fact is usually recognized even in the courts."

To the same effect is the statement of law contained in 14 R. C. L. 618, § 70, and 1 Wigmore on Evidence, § 232, and the note in 97 Am. Dec. 175. The following cases support the view that insanity of collateral blood relatives of the person under investigation may be shown: In re *Myer's*

*Will,* 184 N. Y. 54, 76 N. E. 920, 6 Ann. Cas. 26; *Walsh* v. *People,* 88 N. Y. 458; *Commonwealth* v. *Winnemore,* 1 Brewst. (Pa.) 356; *People* v. *Garbutt,* 17 Mich. 9, 97 Am. Dec. 162; *Prentis* v. *Bates,* 88 Mich. 567, 50 N. W. 637; Id., 93 Mich. 234, 53 N. W. 153, 17 L. R. A. 494; *Watts* v. *State,* 99 Md. 30, 57 A. 542; *Commonwealth* v. *Dale,* 264 Pa. 362, 107 A. 743, 6 A. L. R. 1482; *Martin* v. *Beatty et al.,* 254 Ill. 615, 98 N. E. 996; *People* v. *Harris,* 169 Cal. 53, 145 P. 520; *Prewitt* v. *State,* 106 Miss. 82, 63 So. 330, 6 A. L. R. 1476. It would thus seem upon both principle and authority that evidence of insanity of collateral blood relatives of the person being investigated for sanity is a proper matter of inquiry, and the degree that such collateral insane relative is removed from the particular person whose sanity is being questioned goes to the weight of such evidence rather than to its admissibility. Obviously, the weight of evidence of insanity of collateral blood relatives is also affected by whether there is or is not proof of sanity or insanity in the other blood strain of such collateral relative. It is not necessary for us in the instant case to determine the degree that a collateral blood relative must be removed from the person whose sanity is in question before such evidence may properly be excluded. Suffice it to say that the trial court was in error in excluding the evidence that the cousin of defendant's father and a cousin of defendant's grandmother were insane.

Complaint is also made because the county attorney did not approve the issuance of a warrant for the arrest of the defendant as provided by Comp. Laws Utah 1917, § 8688, and also because defendant did not have counsel to represent him at the preliminary hearing. The record before us is silent as to whether defendant did or did not have counsel to represent him at the preliminary hearing. These questions were not raised until after the trial in the court below. The defendant having entered his plea of not guilty to the information and having gone to trial on the merits, he may not now be heard to complain. The irregularities complained of were waived when defendant

failed to raise them at the proper time. 16 C. J. 184, §§ 256-257; *State* v. *Mewhinney*, supra.

For the reasons stated, the judgment appealed from is reversed. This cause is remanded to the district court of Davis county, with directions to grant the defendant a new trial.

STRAUP and EPHRAIM HANSON, JJ., concur.

FOLLAND, J. (concurring).

I concur. In the prevailing opinion is a statement with respect to presumptions as follows:

"When evidence tending to show that the accused was insane enters into the case, the presumption of sanity disappears from the case, and the jury is no longer concerned with the presumption of sanity, but must determine the fact of sanity or insanity solely from the evidence. The presumption of sanity is not evidence of sanity, and may not be so considered by the jury where there is evidence before the jury tending to show that the accused was insane at the time charged."

With this I am in accord so far as it goes, but as a statement of a general rule it should, in my opinion, have the qualification that the presumption is not destroyed or eliminated from the case by evidence which the jury disbelieves. If the only evidence tending to prove insanity is such that it is disbelieved and disregarded by the jury, then the presumption of sanity remains and should have the effect as if no evidence had been introduced tending to prove insanity. The jury might well be instructed that in weighing the evidence they may not consider the presumption, yet, if uninfluenced by the presumption they reach the conclusion that the evidence tending to show defendant's insanity is not entitled to credit and is disregarded by them, the presumption of sanity may then be regarded as remaining in force. See article on "Presumptions" by Professor Edmund M. Morgan, 44 Harvard Law Review, 906.

This distinction may be be academic so far as its application to the instant case is concerned, because there is ample

evidence in the record from which the jury would be justi-
fied in finding the defendant sane at the time of the com-
mission of the crime without being forced to rely upon the
presumption of sanity in the event they should disbelieve
the evidence adduced by the defendant tending to prove
insanity.

CHERRY, C. J., dissents.